No. 23-2047

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

MILLER INDUSTRIES TOWING EQUIPMENT INC.,
*Plaintiff-Appellant,*

— v. —

NRC INDUSTRIES,
*Defendant- Appellee.*

---

Appeal from the United States District Court
for the District of New Jersey
Judge Noel L. Hillman
Case No. 1:21-cv-08158-NLH-EAP

---

## CORRECTED BRIEF FOR APPELLANT

---

Michael P. Mazza
Paul R. Hale
Michael P. Mazza, LLC
686 Crescent Blvd.
Glen Ellyn, Illinois 60137
Phone: (630) 858-5071
Fax: (630) 282-7123

Leonard E. Hudson
The Collins Law Firm, P.C.
1770 Park Street, Suite 200
Naperville, Illinois 60563
Phone: (630) 527-7098
Fax: (630) 527-1193

*Attorneys for Appellant
Miller Industries Towing
Equipment Inc.*

# EXEMPLARY PATENT CLAIM

## Claim 1 of USPN 9,440,577 (A46, 8:29-62):

A wrecker-type recovery vehicle for recovering other, disabled vehicles, comprising: a vehicle frame extending along a longitudinal axis, the vehicle frame supporting a vehicle body and carrying an extensible and retractable boom; and manually-manipulable wrecker controls located on and supported by a control panel stored within an interior compartment of the wrecker supported by the vehicle body, the wrecker controls configured to control movement of one or more wrecker components useful in vehicle recovery, wherein the control panel has a base end and a distal end opposite the base end; and the control panel moveable from a first, storage position within the interior compartment of the vehicle body, wherein the control panel in the first position is operable to close off the interior compartment from an operator of the wrecker controls, to a second, operable position displaced from and outside the compartment and remote from the vehicle exterior, in a direction perpendicular to the longitudinal axis, wherein the control panel in the second position provides an open interior compartment in which the wrecker controls are located in a position where they may be manipulated by the operator, and wherein in the second position the control panel is downwardly-angled relative to ground such that the distal end is located remote from the vehicle body and below a horizontal axis parallel to ground and intersecting the base end, and wherein the control panel remains supported by the vehicle body while in the second position, whereby the displacement of the control panel to the second position comprises a strategic location of the wrecker controls, providing an operator with an ergonomically-enhanced work surface.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-2047

**Short Case Caption** Miller Industries Towing Equipment Inc. v. NRC Industri

**Filing Party/Entity** Appellant Miller Industries Towing Equipment Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/29/2023

Signature: s/Michael P. Mazza/

Name: Michael P. Mazza

i

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Miller Industries Towing Equipment Inc. | | Miller Industries, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
March 2023

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable          ☐     Additional pages attached

| | | |
|---|---|---|
| Liza M. Walsh, Walsh Pizzi O'Reilly Falanga LLP | Jessica K. Formichella, Walsh Pizzi O'Reilly Falanga LLP | |
| Katelyn O'Reilly, Walsh Pizzi O'Reilly Falanga LLP | William T. Walsh, Jr., Walsh Pizzi O'Reilly Falanga LLP | |
| Selina M. Ellis, Walsh Pizzi O'Reilly Falanga LLP | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐     Yes (file separate notice; see below)     ☑     No     ☐     N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable          ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

*Page(s)*

Certificate of Interest…………………………………………………………i

Table of Authorities………………………………………………………viii

Statement of Related Cases……………………………………………xi

Statement of Jurisdiction…………………………………………………1

Issues Presented for Review……………………………………………2

Introduction…………………………………………………………………3

Statement of the Case……………………………………………………5

    A. Overview of MITE's Patented Technology: The Moveable
       Wrecker Controls……………………………………………………5

    B. Claims in MITE's Patent……………………………………………12

       1. Asserted independent Claims 1 and 14…………………………16

       2. Dependent Claims……………………………………………17

       3. Independent Claim 16………………………………………17

    C. Patent Prosecution History……………………………………18

    D. Proceedings Below………………………………………………20

       1. The Disputed Terms…………………………………………20

       2. The *Markman* Order…………………………………………21

       3. The Judgment of Noninfringement…………………………23

Summary of the Argument…………………………………………………...23

Standard of Review……………………………………………………………29

Argument………………………………………………………………………..30

I. The district court erred in construing the term "control panel" as "a [singular] unit on which controls for the wrecker are attached or integrated" for Disputed Term 1………………………………………31

   A. The district court's construction of "control panel" improperly limits the scope of the Asserted Claims by excluding the Figure 3A preferred embodiment……………………………………………...31

      1. The claims can be construed to cover Figure 3A, a preferred embodiment…………………………………………………….32

      2. The district court incorrectly concluded that it was sufficient that Claim 22 covers Figure 3A…………………………………34

   B. The district court erred by failing to analyze the prosecution history, during which the claim term "control panel" was first introduced………………………………………………………………36

      1. NRC admitted that the prosecution is relevant and must be considered………………………………………………………37

      2. MITE told the PTO that the Asserted Claims cover both the Figure 3 and 3A examples………………………………………38

      3. The Interview and Final Amendment confirm that the claims cover both Figures 3 <u>and</u> Figure 3A…………………………39

      4. The cited prior art is very different from MITE's claimed inventions……………………………………………………….42

   C. The district court erred in finding that a "control panel" that included a separate door is inconsistent with the plain meaning of the term, because a control panel may include a separate closing portion and need not be a singular unit….........................46

v

D. The district court erred in adopting NRC's contention that the "control panel" must be attached to or integrated with the wrecker controls……………………………………………………..49

E. Dependent Claims 3 and 4 and Independent Claim 16 show that MITE's claim construction is correct………………………………52

    1. The Claim 1/4 combination uses "control panel" to mean at least a portion of the control panel, and shows that Claim 1 covers Figure 3A, without requiring any sort of "attachment."…………………………………………………..52

    2. The Claim 1/3 combination shows that Claim 1 covers Figure 3A…………………………………………………………..54

    3. Independent Claim 16 uses "control panel" to mean at least a portion of the "control panel."…………………………………55

F. The district court should have considered MITE's extrinsic evidence………………………………………………………………56

    1. The district court improperly disregarded Mr. Brown's unrebutted declarations that showed a POSA would have understood that "control panel" covered the Figure 3A example……………………………………………………………56

    2. Co-inventor Ralph McConnell's testimony does not change the plain meaning of the claims as established by the intrinsic evidence……………………………………………………………59

G. NRC violated claim construction rules by using the accused products in an attempt to construe the claims…………………..61

II.   The district court erred when it construed Disputed Terms 1 and 3-7 to exclude from the scope of "control panel" any component that is not attached to or integrated with a singular unit……………………………………………………………………..62

    A. The district court's construction of Disputed Terms 3-7 was infected by its erroneous construction of "control panel."….......62

B. The district court incorrectly rejected MITE's proposed construction for Disputed Terms 3, 6 and 7, that "at least a portion" of the "control panel" closes off the compartment……..63

1. "Control panel" can refer to a portion of the control panel when context requires……………………………………………63

2. The district court improperly imposed language on the claims that does not exist in the claims………………………….64

3. Claims 1/4 and 16 use "control panel" to mean at least a portion of the control panel……………………………………...66

4. The district court incorrectly held that any element not "attached or integrated" with a "unit" carrying the wrecker controls cannot constitute part of the "control panel."……...66

Conclusion and Statement of Relief Sought……………………………67

Addendum (with Cover Page and Index at 69)…………………..Appx1-48

Certificate of Compliance………………………………………………117

Certificate of Service……………………………………………………118

# TABLE OF AUTHORITIES

**Cases** *Page(s)*

*Aventis Pharm. v. Amino Chem. Ltd.,*
715 F.3d 1363 (Fed. Cir. 2013)..................................…………52, 64

*Bell Comms. Research, Inc. v. Vitalink Comms. Corp.,*
55 F.3d 615 (Fed. Cir. 1995)……………………………………..36, 38

*DSW, Inc. v. Shoe Pavilion, Inc.,*
537 F.3d 1342 (Fed. Cir. 2008)............................................... 42

*Dyfan, LLC v. Target Corp.,*
28 F.4th 1360 (Fed. Cir. 2022) .........................................57, 59

*Elekta Inst. S.A. v. O.U.R. Sc. Intern. Inc.,*
214 F.3d 1302 (Fed. Cir. 2000)............................................... 38

*GE Lighting Sols., LLC v. AgiLight, Inc.,*
750 F.3d 1304 (Fed. Cir. 2014)....................................4, 24, 31, 33-35, 52

*Gemtron Corp. v. Saint-Gobain Corp.,*
572 F.3d 1371 (Fed. Cir. 2009)............................................... 49

*Hoechst Celanese Corp. v. BP Chems. Ltd.,*
78 F.3d 1575 (Fed. Cir. 1996).................................................. 32

*Honeywell Inc. v. Victor Co. of Japan, Ltd.,*
298 F.3d 1317 (Fed. Cir. 2002).........................................36-37

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.,*
540 F.3d 1337 (Fed. Cir. 2008).........................................59, 61

*Integra LifeSciences Corp. v. HyperBranch Medical Technology, Inc.*,
2017 WL 5172396 (D. Del. Nov. 8, 2017)..................................................57

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001)..................................................35

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
327 F.3d 1364 (Fed. Cir. 2003)..................................................32

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
933 F.3d 1345 (Fed. Cir. 2019)…………………………………………….36, 38

*Lazare Kaplan Intern., Inc. v. Photoscribe Techn., Inc.*,
628 F.3d 1359 (Fed. Cir. 2010)…………………………………………….42

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995)……………….21, 24, 27, 30, 31, 37, 59, 67, 69

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
287 F.3d 1062 (Fed. Cir. 2002)..................................................61

*Oatey Co. v. IPS Corp.*,
514 F.3d 1271 (Fed. Cir. 2008)..................................................31, 46

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)......................30, 36, 47, 48, 51, 52, 56, 65

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed. Cir. 2001)..................................................31, 49, 64-65

*SpeedTrack, Inc. v. Amazon.com*,
998 F.3d 1373 (Fed. Cir. 2021) ..................................................29

*SRI Intern. v. Matsushita Elec. Corp. of America*,
775 F.2d 1107 (Fed. Cir. 1985)..................................................54

ix

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002)...................................................30, 47, 65

*Vas-Cath, Inc. v Mahurkar*,
935 F.2d 1555 (Fed. Cir. 1991).................................................................57

*Verizon Services Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007)...................................................32, 45, 46

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)............................................................32, 36

*Wi-LAN USA, Inc. v. Apple Inc.*,
830 F.3d 1374 (Fed. Cir. 2016)................................................................54

## Statutes & Rules

28 U.S.C. § 1295(a)(1)...................................................................1

Fed. Cir. R. 47.5(a)(1)-(2)...........................................................xi

Fed. R. Civ. P. 54(b)..........................................................1, 23, 69

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5(a)(1)-(2), Appellant Miller Industries Towing Equipment Inc. ("MITE") states that no other appeal in or from this civil action or any proceeding in the originating tribunal was previously before this or any other appellate court.[1] MITE also states that there is no case known to counsel to be pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision in the pending case.

---

[1]    MITE previously sued NRC in Case No. 1:19-cv-00095-PLR-SKL (E.D. Tenn.) for infringement of MITE's Patent, and additional design patents not subject to this litigation. That case was dismissed for lack of personal jurisdiction, without any decision on the merits or claim construction.

## STATEMENT OF JURISDICTION

This appeal arises from the district court's final judgment that Appellee NRC Industries ("NRC") does not infringe the Asserted Claims of MITE's Patent. That judgment was certified for immediate appeal under Federal Rule of Civil Procedure 54(b) on May 18, 2023. (Appx33-35.) MITE filed a timely notice of appeal on June 13, 2023. (Appx1405-06.) This Court has exclusive jurisdiction under 28 U.S.C. § 1295(a)(1).

# ISSUES PRESENTED FOR REVIEW

Did the district court err as a matter of law when it: (1) construed the claim term "control panel" as "a [singular] unit on which controls for the wrecker are attached or integrated," thereby excluding the preferred embodiment of Figure 3A, for Disputed Term 1 (Appx16); and (2) expressly excluded from the purview of "control panel" any component that is not attached to or integral with this singular unit, for Disputed Terms 3-7 (Appx18-25)?

# INTRODUCTION

MITE invented a new heavy-duty tow truck or "wrecker" that uses a unique moveable, strategically located "control panel" that allows operators to be in a comfortable and sightline-enhanced, ergonomic position during vehicle recovery. U.S. Patent No. 9,440,577 ("MITE's Patent") was issued to MITE in 2016. In 2021, MITE sued its direct competitor, NRC, for infringement of Claims 1-3, 5-9, 11, 13-17, and 20-21 (the "Asserted Claims," Appx135) of MITE's Patent based on wreckers manufactured and sold by NRC.

Asserted independent Claim 1 of MITE's Patent recites a "wrecker-type recovery vehicle" including, among other things, a "control panel" carrying wrecker controls that is "operable to close off the interior compartment" or toolbox of the wrecker. Asserted independent Claims 14 and 16 have similar language. MITE's Patent disclosed two preferred embodiments, Figure 3 and Figure 3A, discussed further below.

Even though Figure 3A is a preferred embodiment, the district court construed the claim term "control panel" to exclude Figure 3A, violating the principle that "'where claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe

the claims to exclude that embodiment, absent probative evidence on the contrary.'" *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1311 (Fed. Cir. 2014) (citation omitted). That was error, and the district court's decision should be reversed.

The district court made additional, subsidiary errors that call for reversal. For example, the district court did not analyze the prosecution history in any articulated fashion. That was a critical error here, because the term "control panel" was not part of the claims of MITE's original patent application, but was introduced to the claims during the patent prosecution. The prosecution history shows that MITE consistently maintained that "control panel" in each of independent asserted Claims 1, 14 and 16 covers each of the two preferred embodiments disclosed in the original patent application, Figure 3 and Figure 3A. The district court also erred in adopting NRC's contention that the entire "control panel" must be attached to or integrated with the wrecker controls, *i.e.,* that it must be a "singular" unit. The Asserted Claims do not use the terms "attachment" or "integration" (or variations thereof) in connection with "control panel," yet the district court improperly imported those terms into the claims. And, while the district court should have adopted MITE's

constructions based solely on the intrinsic evidence alone, the district court should not have rejected MITE's constructions without considering the unrebutted declarations of MITE's expert – the only expert who provided testimony in the case – regarding how a person of ordinary skill in the art ("POSA") would interpret the "control panel" claim term.

## STATEMENT OF THE CASE

### A.    Overview of MITE's Patented Technology:    The Moveable Wrecker Controls.

MITE, based in Ooltewah, Tennessee, is a manufacturer of light duty tow trucks, car carriers, and heavy-duty wreckers used in the vehicle recovery industry. (Appx63, ¶7.) One category of recovery vehicles that MITE designs and manufactures is rotating wreckers, which are large, heavy-duty, recovery vehicles utilizing a rotating boom and capable of lifting and clearing heavy roadway obstructions, *e.g.,* overturned semi-tractor trailers. (Appx63, ¶7.)

MITE's Patent, titled "Vehicle Wrecker with Improved Controls," discloses and claims a "control panel" which supports strategically located wrecker controls that allow an operator to be in a comfortable and sightline-enhanced, ergonomic position during recovery. (Appx36-48.) The wrecker controls are used to operate various features of the wrecker,

such as a rotating extendable and retractable boom, winches, lighting, and other features. (*See* Appx44, 4:39-67.)

Independent Claim 1 of MITE's Patent recites a "wrecker-type recovery vehicle" including wrecker controls "located on and supported by" a "control panel" that is "operable to close off the interior compartment" or toolbox of the wrecker. (Appx46, 8:43-44). Asserted independent Claim 14 has similar language (Appx47, 9:65-66), while independent Claim 16 recites that the "control panel" includes a "door" for effectuating closure (Appx47, 10:33-34). MITE's Patent discloses two preferred embodiments, Figure 3 and Figure 3A, discussed further below.

As disclosed in MITE's Patent, at least a portion of the control panel can be moved outside a toolbox/compartment positioned on the side of the wrecker, improving operator access to the wrecker controls. (*See* Appx39-41, Figures 3, 3A and 4.) This improved access provides the operator with expanded sightlines while using the wrecker controls, and is in stark contrast to the old technology in which the wrecker controls were rigidly located inside the compartment. The old technology required the operator's head to be at least partially located within or closely adjacent to the compartment during use of the wrecker controls, and severely

limited the operator's vision of a crash site during use of the wrecker controls. That problem is illustrated by the prior art shown in Figure 1 of MITE's Patent (Appx37), below:



The movable wrecker controls of MITE's Patent are strategically located for vehicle recovery operations when moved outside of the storage compartment/toolbox. (*See* Appx848-50. ¶¶12, 15.) This position enables operators to more easily access and use the controls, and allows operators

to simultaneously view a disabled vehicle as well as the wrecker controls. (*See* Appx43, 2:62-66; Appx44, 4:19-29; Appx848-50, ¶¶12, 15.) When moved from the interior compartment of the vehicle body, the control panel may also be downwardly-oriented (*i.e.*, viewed from the side, as in Figure 4, the control panel may be tilted downwardly at an angle relative to the ground), presenting the operator with user-friendly, ergonomically-positioned controls (*see* Appx38-41 (Figs. 2, 3, 3A, 4); Appx43, 2:9-12; Appx45, 5:24-27; Appx844, ¶4; Appx848-50, ¶¶12-17).

One example of MITE's invention is shown in Figure 3 from MITE's Patent (Appx39), in which an outwardly-opening, hinged door 25 is employed, and console 30 with the attached wrecker controls is attached to the door:



An alternative preferred embodiment of MITE's invention is shown in Figure 3A (Appx40): upper door 27' closes off compartment 24', while the wrecker controls are supported by a console/platform 30 carried on a separate, lower shelf 25' that slides in and out from the interior of the compartment/toolbox:

**Fig. 3A**



27'

30

24'

25'

PUT HANDS IN FRONT
OF CONTROLLER

**Wrecker Control Console (30)**　　**Shelf (25')**　　**Door (27')**

(*See* Appx45, 5:1-4.)

The Figure 3A "preferred embodiment" (*see* Appx44, 3:51-52; Appx45, 5:1-4), shows that the shelf is part of the "control panel," since it carries the wrecker controls. Upper door 27' is also part of the "control panel," since it is "operable to close off the interior compartment."

10

(Appx45-46, 5:1-4, 8:41-45.) But, as discussed further below, the district court effectively found that Claim 1 and the other Asserted Claims do not cover the Figure 3A example. (Appx16.)

The specification of MITE's Patent explicitly discusses the alternative embodiments in which wrecker controls may be supported by either a door (as in Figure 3), or a shelf (as in Figure 3A). (Appx43, 2:4-9; Appx44, 4:35-40; Appx45, 5:1-4.)

Previously, with prior art such as Addleman (Appx146-69), in which the wrecker controls were fixably located within the toolbox, operators were required to have their head inside or closely adjacent the wrecker controls (*see* Figure 1 of MITE's Patent) in order to operate the controls, causing the operator to lose sight of the rear of the vehicle and the disabled vehicle as she/he operates the wrecker controls. Using the inventions of MITE's Patent, with the wrecker controls located outside of the compartment, as shown in Figures 3 and 3A, wrecker operators enjoy both improved ergonomics and expanded sightlines (Appx39-40), allowing operators to simultaneously view the wrecker controls, the rear

of the wrecker, and the disabled vehicle (e.g., an overturned truck on a bridge). (*See* Appx43-45; Appx844, ¶4; Appx848, ¶12.)[2]

### B.    Claims in MITE's Patent.

Independent asserted Claims 1 and 14 recite a "wrecker-type recovery vehicle for recovering other, disabled vehicles, comprising" a "vehicle frame…" and "manually-manipulable wrecker controls" which are "located on and supported by a control panel" which is "stored within an interior compartment of the wrecker supported by the vehicle" frame or body (Appx46, 8:29-37; Appx47, 9:49-58). Method Claim 16 has similar language (Appx47, 10:20-30).

As discussed above, Figures 3 and 3A disclose alternative examples of the inventions claimed in MITE's Patent, and show how at least a portion of the control panel can be moved outside the interior compartment, by either an outwardly-opening door (Figure 3) or by a sliding shelf (Figure 3A), presenting the wrecker controls for an operator to access.

---

[2]    Inventing a wrecker in which wrecker controls – which control a number of often-complicated wrecker operations (*see* Appx44, 4:40-67) – can be moved outside the compartment was not an insignificant technological hurdle to be surmounted, as shown in MITE's Patent (Appx45, 5:19-49, 6:3-7:9).

The term "control panel" was not used in the original claims. (Appx520-25.) In the specification, "control panel" is referenced four times, and refers to "console 30." (Appx43, 1:19-20 (referencing the prior art); Appx45, 5:50-64; Appx46, 7:10-22.) "Control panel module 30" is also used twice in a similar fashion. (Appx46, 7:10, 7:12.)

Console 30 is shown in Figures 3 and 3A. For the Figure 3 example, console 30 is described as a "composite material" which may be "rigidly mounted" on "outwardly-opening door 25" (Appx44, 4:36-40), thereby presenting the wrecker controls (attached to or formed as part of the composite material) to an operator when the door is opened. Figure 4 is a side view of the toolbox and wrecker controls showing door 25 is open; when closed (door 25 shown in outline), this shuts the toolbox, preventing the wrecker controls inside from being accessed from outside of the toolbox.

For the Figure 3A example, the specification explains that console 30 is supported by shelf 25', which slides in and out of toolbox 24', and that door 27' in Figure 3A opens and closes from the top. (Appx45, 5:1-4.) Opening door 27' allows an operator to pull out separate sliding shelf 25', thereby allowing easy access to the wrecker controls. When door 27' is

13

closed, the district court found this "fully close[s] off access to the wrecker controls. . . ." (Appx8.)

During the prosecution of MITE's Patent the term "control panel" was introduced to the claims, and it was crystal clear that it was no longer synonymous with the term "console 30," as in the claims it is now said to perform three functions: (1) *supporting* the wrecker controls (Claim 1, Appx46, 8:34-35; Claim 14, Appx47, 9:55-56; Claim 16, Appx47, 10:27-28); (2) being *moveable* from a storage position within the interior compartment to an open position outside the interior compartment where the wrecker controls are accessible to an operator (Claim 1, Appx46, 8:41-42, 8:45-53; Claim 14, Appx47, 9:65-10:1; Claim 16, Appx47, 10:37-42); and (3) *closing* off the interior compartment, when in the storage position, so that the operator can no longer access the wrecker controls (Claim 1, Appx46, 8:43-45; Claim 14, Appx47, 9:65-66; Claim 16, Appx47, 10:30-34). (*See also* Appx1336.)

With the Figure 3 example, the door performs all three claimed functions of *supporting* the wrecker controls, *moving* them in and out of the compartment, and *closing off* the compartment. With the Figure 3A example, the support and movement functions are performed by shelf 25',

while the closure function is provided by a separate, unattached door 27'. (Appx43, 2:6-9; Appx45, 5:1-4.)

In the revised claims, the fact that "control panel" is no longer synonymous with "console 30" (*i.e.* the direct support for the wrecker controls) is perhaps best understood by the fact that console 30 does not close off the interior compartment, as claimed. Instead, this *closure* function is accomplished in the respective, alternative examples of the invention by either door 25 (Figure 3) or door 27' (Figure 3A). The *moveability* and *support* functions are accomplished by either door 25 (Figure 3) or shelf 25' (Figure 3A). In short, "console 30" does not provide the three claimed functions, so it cannot be the "control panel."

Independent Claims 1 and 14 also recite that when the control panel is in the "second position" outside of the interior compartment, the control panel may be "downwardly-angled" to provide an "ergonomically-enhanced work surface" (Appx46, 8:52-62; Appx47, 10:5-13.) The specification discloses that this "downwardly-angled" orientation can be achieved with either of the Figure 3 or 3A examples. (Appx43, 2:9-12.)

## 1. Asserted independent Claims 1 and 14.

Claims 1 and 14 recite the term "control panel," without reference to a door or shelf. When the Figure 3 example is applied to these claims, a single element – door 25 – performs all three claimed functions of the "control panel." When the Figure 3A example is applied to these claims, two separate elements function together as the "control panel": shelf 25' and door 27'. This is because door 27' opens and closes the compartment, while shelf 25' carries the wrecker controls. Accordingly, for the Figure 3A example, "control panel" must be interpreted to mean "at least a portion of the control panel" in several locations. For example, Claim 1 recites that the "control panel is moveable" between a storage position within the compartment and an extended position outside the compartment (Appx46, 8:41-48); here, per Figure 3A, it is only shelf 25' that is being referenced, as door 27' must be opened upwardly for storage inside the compartment, so that extended shelf 25' can be accessed. Similarly, when Claim 1 recites that the "control panel … is operable to close off the interior compartment" (Appx46, 8:43-44), only door 27' is performing the closure function, not shelf 25' (which has already been slid inside the interior compartment).

16

### 2. Dependent Claims.

MITE's Patent includes two dependent claims that depend on independent Claim 1.

Claim 3 of MITE's Patent recites: "The wrecker-type recovery vehicle of claim 1, wherein control panel comprises *an outwardly-opening door* associated with a compartment accessible from an exterior of the vehicle, and wherein the door can be closed to form a closed compartment." (Appx47, 9:4-8 (emphasis added).) This is the Figure 3 example.

Claim 4 of MITE's Patent recites: "The wrecker-type recovery vehicle of Claim 1, wherein the control panel comprises *an outwardly sliding shelf* within a compartment located within an interior of the vehicle." (Appx47, 9:9-12 (emphasis added).) This is the Figure 3A example.

### 3. Independent Claim 16.

Independent Claim 16 recites both an "outwardly-opening door" (Appx47, 10:31), as in Figure 3, and that "when the control panel door is opened, the control panel [*e.g.,* the door (per Figure 3) or the shelf (per

17

Figure 3A)] is moveable" between storage and extended positions. (Appx47, 10:37-43.)

### C.     Patent Prosecution History.

The term "control panel" was not included in the claims of MITE's original patent application, but was added during the prosecution. (*See, e.g.,* Appx551, Appx554-55.) Both Figures 3 and 3A were part of the original application as filed (Appx494-95), and MITE repeatedly informed the Examiner during prosecution that Claim 1 covers *both* of the examples in these drawings. For example, in MITE's July 27, 2015 amendment, MITE explained that the "control panel" in independent Claims 1, 14 and 16 is supported by the vehicle frame and that this support can be indirect, "such as through the use of a hinged compartment door or a sliding cabinet shelf." (Appx550-59, at Appx558.)

Later, in an April 13, 2016 amendment, MITE said certain independent claims (Claims 1 and 17, which became issued Claims 1 and 14) had "different structural limitations" than the door of issued Claim 16 or the shelf of issued Claim 22. (Appx645-52, at Appx652.) (Issued Claims 1 and 14 recite neither a "door" nor a "shelf.") Additionally, in a March 24, 2016 Rule 116 Amendment, MITE explained that both Claim

3 (reciting a "door") and Claim 4 (reciting a "shelf"), each of which depend from Claim 1, were separately patentable over prior art cited by the Examiner. (Appx633-43, at Appx641-42.)

In the July 18, 2016 Examiner's Interview statement, the Examiner "suggested" a potential narrowing claim revision, "such as door 25 which supports the wrecker controls and closes the compartment." (Appx748.) But MITE declined the Examiner's suggestion. Instead, one day later, on July 19, 2016, MITE filed a final amendment more broadly revising the claims (Appx737-744.) For example, Claim 1 was revised in two ways: (1) when the control panel is in the first (non-extended) position, it "is operable to close off the interior compartment"; and (2) when the control panel is in the second (extended) position, it "provides an open interior compartment . . . ." (Appx738.) Similar revisions were made to Claim 14 (Claim 17 during prosecution) in the July 19, 2016 response. (Appx740-41.) Claim 16 (Claim 19 during prosecution) already had similar language. (Appx741-42.) As to issued Claim 16, the Examiner in his August 4, 2016 Notice of Allowance added clarifying language that when the door is closed, a "closed interior compartment is provided." (Appx755.)

19

Claims with these revisions still cover both the Figure 3 and Figure 3A examples. Nowhere in the prosecution history does MITE require or specify that the "control panel" only includes a door, for example.

### D.    Proceedings Below.

#### 1. The Disputed Terms.

During claim construction, the parties chiefly disputed the meaning of the claim term "control panel" ("Disputed Term 1"). (Appx7-8.) The parties submitted the following proposed constructions for "control panel":

**MITE's proposed construction:** "A platform on which wrecker controls are located and supported, and may also include a separate closing portion for closing off an interior compartment of the vehicle." (Appx7-8.)

**NRC's proposed construction:** "A unit on which controls for the wrecker are attached or integrated." (Appx7-8.)

In briefing, NRC further explained its construction of the term: "Because the control panel is *a singular unit* on which the wrecker controls are mounted or integrated, it is movement of the control panel that 'closes off the compartment,' not movement of some other component

20

that is neither attached to or integral with the control panel." (Appx457 (emphasis original).) The district court quoted NRC's "singular unit" argument in its decision, maintaining the emphasis. (Appx17.)

The district court's adoption of NRC's construction of "control panel" also led it to adopt NRC's version of Disputed Terms 3-7, each of which also employ that term. (Appx16-25.)

### 2. The *Markman* Order.

On April 13, 2023, the district court issued a claim construction decision adopting NRC's proposed construction of "control panel" (Appx16). This decision excludes the Figure 3A example and ignores the prosecution history showing that the Asserted Claims cover both Figure 3 and Figure 3A. The district court also made the following subsidiary findings:

- "defining control panel to include an entirely separate door is inconsistent with the plain meaning of the term" (Appx15);

- "claim 1 only reads on the Figure 3 embodiment, not the Figure 3A embodiment" (Appx16) and "it is sufficient that one independent claim reads on the Figure 3A embodiment. Unasserted, independent claim 22 clearly covers the Figure 3A embodiment, describing a 'control panel comprising an outwardly sliding shelf' and a 'door separate from the control panel.' . . . . Thus, construing 'control panel' to not include the closing structure in all embodiments and designs is consistent with the canon of claim differentiation – claim 1 includes a

21

control panel that closes off the control storage compartment, whereas claim 22 includes a control panel and a separate closing structure." (Appx15);

- "[T]he fact that claim 1 is not limited to a control panel consisting of a door does not require an interpretation that fits the Figure 3A embodiment into the claim 1 language" (Appx16).

Based upon its construction of "control panel," the district court went on to adopt NRC's proposed constructions for Disputed Terms 3-7[3], each of which references or requires use of the "control panel." (Appx18-25.) In so doing, the district court made further findings regarding its construction:

- In rejecting MITE's proposed construction for Disputed Terms 3, (*i.e.,* that "at least a portion of the control panel in the first position blocks the operator from accessing the interior of the compartment"), the district court found that "Miller's proposed construction adds language that does not exist in the claim." (Appx18.) The court rejected similar proposed constructions for Disputed Terms 6 and 7. (Appx23-25.)

- By adopting NRC's proposed constructions for Disputed Terms 3-7, the district court found that the "control panel" cannot include any "other component not attached to or integral with"

---

[3]    The district court adopted MITE's construction for Disputed Term 8, a term only found in Claim 16, that expressly recites that the "control panel" comprises an "outwardly-opening door…." (Appx25-26). In doing so, the court inexplicably found that MITE's construction "more closely aligns" with a construction of "[a] unit on which controls for the wrecker are attached or integrated" (Appx26) – even though MITE never advanced or argued for such a construction.

the "unit on which controls for the wrecker are attached or integrated." (Appx19-26.)

Finally, the district court stated that it did not consider the parties' arguments concerning extrinsic evidence. (Appx15.)

### 3. The Judgment of Noninfringement.

After the district court issued its claim construction opinion, MITE moved unopposed for a final judgment of noninfringement because given the district court's decision, there was no just reason for delaying a final judgment to allow for appeal. (Appx1393-1404.) On May 18, 2023, the district court entered a final judgment of noninfringement pursuant to Federal Rule of Civil Procedure 54(b). (Appx33-35.)

### SUMMARY OF THE ARGUMENT

The district court erred in its construction of the claim term "control panel," including when it excluded from the scope of "control panel" any component that is not attached to or integrated with a singular unit.

The district court construed "control panel" as "a unit on which controls for the wrecker are attached or integrated." (Appx16.) In so doing, the district court found that the Asserted Claims do not cover the

23

Figure 3A preferred embodiment. This construction is plainly wrong, for six separate reasons.

*First*, the district court erred in construing "control panel" to exclude a preferred embodiment, the Figure 3A example, because "'where claims *can* reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary.'" *GE Lighting*, 750 F.3d at 1311 (citation omitted). Yet that is just what the district court did here. The Asserted Claims *can* be construed to cover the preferred embodiment shown in Figure 3A, and the district court erred in not doing so.

*Second*, the district court erred by failing to analyze the prosecution history in any articulated fashion, even though it was in the prosecution history that the claim term "control panel" was first introduced. Even NRC told the district court that the prosecution history was relevant and must be considered – indeed, NRC conceded that the claims covered both Figures 3 and 3A up until the final amendment. Yet the district court's *Markman* opinion contains no analysis of the prosecution history. This was error. During prosecution, MITE clearly told the Patent Office that "control panel" in each of independent asserted Claims 1, 14 and 16

covers *both* the Figure 3 and Figure 3 examples. MITE's final amendment and the PTO's notice of allowability also support MITE's proposed construction. And because MITE's claimed inventions are very different from the cited prior art, there was no need for MITE to narrow the term "control panel" to either the "door" or "shelf" examples of Figures 3 and 3A, and MITE did not do so. Yet, the district court's opinion reflects no consideration of this intrinsic evidence.

*Third*, the district court erred in finding that a "control panel" that includes a separate door (such as in Figure 3A) is somehow inconsistent with the plain meaning of the term. Figure 3A itself belies the district court's finding, as it discloses two unattached elements (shelf 25' and door 27') that work together as the claimed "control panel." Thus, the district court failed to consider the context in construing the claim term. Also, the notion that a singular noun must always refer to a singular unit defies plain English, in which there are countless everyday instances where singular nouns cover multi-piece structures.

*Fourth,* the district court erred in adopting NRC's contention that the "control panel" must be attached to or integrated with the wrecker controls. The Asserted Claims do not use the terms "attachment" or

"integration" (or variations thereof) in connection with "control panel." The district court erroneously imported those narrower terms into the claims.

*Fifth*, dependent Claims 3 and 4, and independent Claim 16, show that MITE's claim construction is correct. The Claim 1/4 combination uses "control panel" to mean at least a portion of the control panel, because it recites that the "control panel" includes an "outwardly-sliding shelf," and the *only* example disclosed in MITE's Patent that has these attributes is Figure 3A. Dependent Claim 4, therefore, covers Figure 3A, so independent Claim 1 does so, too. The Claim 1/3 combination also shows that Claim 1 covers Figure 3A. Dependent Claim 3 recites that the control panel includes an "outwardly opening door," per *Figure 3*. The only example disclosed in MITE's Patent that has these attributes is Figure 3. But if Claim 1 were interpreted as already being limited to the Figure 3 example, as the district court has essentially done, that would erroneously render Claim 3 superfluous.

Independent Claim 16 also uses "control panel" to mean at least a portion of the "control panel." Claim 16 recites an "outwardly-opening door" as in Figure 3 (Appx47, 10:30-31), while also reciting that "when

26

the control panel door is opened, the control panel is moveable" between storage and extended positions (Appx47, 10:37-42). This latter language, when applied to the Figure 3 example, means that when door 27' is open, separate shelf 25' (carrying the wrecker controls) is moveable. The second time "control panel" is used here, then, refers to only a portion of the "control panel" (*i.e.*, the shelf).

*Sixth*, the district court should have considered MITE's extrinsic evidence. The district court should have adopted MITE's constructions based solely on the intrinsic evidence alone (because the Asserted Claims should properly be construed to cover Figure 3A). But it certainly should not have rejected MITE's constructions without considering the two unrebutted declarations of MITE's expert and co-inventor, Joseph C. Brown (Appx842-51; Appx1017-21), or at least permitting him to testify at the *Markman* hearing. These expert declarations were the only direct evidence in the record from a person of ordinary skill in the art ("POSA") that discuss how and why a POSA would interpret the "control panel" claim language.

Mr. Brown explains that "[a] POSA would have understood from reading MITE's Patent that 'control panel' can cover products, such as

27

the FIGURE 3A example in MITE's Patent, in which the wrecker controls are not attached to the door." (Appx847-48, ¶11.) Mr. Brown's declarations also show that the claim constructions adopted by the district court could not possibly be correct, as they do not account for the "closure" function expressly required by the Asserted Claims, and that the door in each of Figure 3 and Figure 3A accomplishes this function. (Appx847-48, ¶11; *see also* Appx1020, ¶¶10-11.)

Mr. Brown also explains that the district court's construction incorrectly requires that the wrecker controls be "attached or integrated" to a singular "unit," even though this is a feature of only one preferred example (Figure 3), and the patent claims are clearly broader than this, as they use the terms "located and supported" and cover the example of Figure 3A where the shelf supports the wrecker controls and the door is not attached to the shelf. (Appx847-48, ¶11.) The district court completely ignored Mr. Brown's declarations.

The district court also erred when it construed Disputed Terms 3-7 to exclude from the scope of "control panel" any component that is not attached to or integrated with a singular unit, for two reasons.

*First*, the district court's construction of Disputed Terms 3-7 was infected by its erroneous construction of "control panel."

*Second*, the district court incorrectly rejected MITE's proposed construction for Disputed Terms 3, 6 and 7, that "at least a portion" of the "control panel" closes off the compartment. The district court stated that MITE's construction "adds language that does not exist in the claim." But if the district court had not ignored Mr. Brown's unrebutted declaration, the district court would have understood that "control panel" in the claims can refer to a portion of the control panel, when the context requires. The district court also erred in construing "control panel" in association with Disputed Terms 1 and 3-7 by requiring the addition of verbiage – the terms "attached" and "integrated" – which do not appear in the claims in connection with "control panel."

## STANDARD OF REVIEW

This Court reviews claim construction determinations based on intrinsic evidence *de novo* and reviews factual findings about extrinsic evidence for clear error. *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1378 (Fed. Cir. 2021). The district court's reliance (or lack thereof) on extrinsic evidence is reviewed for clear error. *Id.* at 1378. Here, the

district court stated that it relied solely on intrinsic evidence in reaching its conclusion, although MITE offered extrinsic evidence. (Appx15.)

## ARGUMENT

This Court should reverse the district court's *Markman* order and vacate the final judgment. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation omitted). Thus, "the words of a claim 'are generally given their ordinary and customary meaning,'" which "is the meaning that the term would have to a [POSA] in question at the time of the invention." *Id.* at 1312-13 (citation omitted). "Importantly, the [POSA] is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. "The words used in the claims are interpreted in light of the intrinsic evidence of record, including the written description, the drawings, and the prosecution history, if in evidence." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). "In addition, unless compelled to do otherwise, a court will give a claim term the full

30

range of its ordinary meaning as understood by an artisan of ordinary skill." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

"In particular, 'where claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary.'" *GE Lighting,* 750 F.3d at 1311 (citation omitted). Applying these principles here requires reversal of the district court's *Markman* order.

## I.    The district court erred in construing the term "control panel" as "a [singular] unit on which controls for the wrecker are attached or integrated" for Disputed Term 1.

### A.    The district court's construction of "control panel" improperly limits the scope of the Asserted Claims by excluding the Figure 3A preferred embodiment.

The district court incorrectly held that the Asserted Claims do not cover Figure 3A. (Appx16.) Courts "normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification," unless "those embodiments are clearly disclaimed in the specification" or prosecution. *Oatey Co. v. IPS Corp*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008). MITE made no such disclaimers.

31

### 1. The claims can be construed to cover Figure 3A, a preferred embodiment.

Figure 3A is a preferred embodiment. (*See* Appx44-45, 3:51-52, 5:1-4.) This Court has rejected claim constructions that excluded embodiments described in the specification. *See, e.g., Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (rejecting construction that would exclude several examples in the specification, where neither specification nor ordinary meaning required "destination" to mean "final destination"); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1369 (Fed. Cir. 2003) (finding district court's claim construction erroneously excluded an embodiment described in an example in the specification, where the prosecution history showed no such disavowal of claim scope); *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1580–81 (Fed. Cir. 1996) (refusing to adopt a claim construction of "stable" that would exclude the preferred embodiment disclosed in the specification); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (a claim interpretation that excludes a preferred embodiment is "rarely, if ever, correct").

32

"In particular, 'where claims *can* reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary.'" *GE Lighting*, 750 F.3d at 1311 (citation omitted) (emphasis added). In *GE Lighting*, this Court rejected a lower court's construction that excluded a specific embodiment, because there were "no statements during prosecution or in the specification that indicate the patentee's intent to limit his claim," and the specification made clear that the patentee considered the embodiment to be covered. *Id.*

Similarly here, both the specification and the prosecution history make clear that the patentee considered Figure 3A to be covered by at least Claims 1 and 14[4], and there is no disclaimer anywhere. The Figure 3A example discloses two separate, unattached elements (shelf 25' and door 27') that work together as the claimed "control panel": shelf 25' both *supports* the wrecker controls and *moves* them, while separate *door* 27' *closes off* the compartment. The claim term "control panel" thus *can* be construed to cover the Figure 3A example, in accordance with MITE's

---

[4]     Claim 16's recitation of "outwardly opening door" obviates literal (if not equivalent) coverage of Figure 3A's disclosure of a door with downward (garage door-type) closure.

proposed construction, and there is no probative evidence why it should not be so construed. Accordingly, the district court should have adopted MITE's proposed construction. *See GE Lighting,* 750 F.3d at 1311. The district court's decision is thus reversible error. *Id.* at 1311-12.

### 2. The district court incorrectly concluded that it was sufficient that Claim 22 covers Figure 3A.

According to the district court, "it is sufficient that one independent claim [unasserted independent Claim 22] reads on the Figure 3A embodiment" (Appx15.) But the district court did not articulate why this should be so, and there is no good reason for it.

Non-asserted independent Claim 22 recites that the control panel includes: (a) an outwardly-sliding shelf (Appx48, 12:5-6); and (b) "a door separate from the control panel" which is "sliding and generally vertically moving" (Appx48, 12:11-13). Of course, element (b) requires the presence of a "door," but cannot mean that the door is not part of the "control panel," but rather must mean that it is separate from the shelf, earlier recited in the claims. A contrary conclusion – that this means a "door" can never be part of the "control panel" – is nonsensical and would mean that the claims cover no examples in the patent. In short, Claim 22 *supports* MITE's construction of "control panel," not detracts from it,

because it shows that the "control panel" can include both a door and a shelf.

This part of the district court's opinion also ignores the principle of claim construction discussed above, that "'where claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary.'" *GE Lighting*, 750 F.3d at 1311 (citation omitted). In short, just because unasserted Claim 22 covers Figure 3A does not mean that other claims cannot.

Further, that Claim 22 covers Figure 3A and not Figure 3 does not mean that Claim 1, which is broader than Claim 22, cannot cover both examples. *See Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342-43 (Fed. Cir. 2001) (because a narrower independent claim (Claim 37) excluded a preferred embodiment of real-time delivery of information, the doctrine of claim differentiation required that independent Claim 1 be broadly construed to cover all preferred embodiments of the patent).

**B.**    **The district court erred by failing to analyze the prosecution history, during which the claim term "control panel" was first introduced.**

Courts "should also consider the patent's prosecution history if it is in evidence." *Phillips*, 415 F.3d at 1317 (citation omitted). "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution . . . ." *Id.* Here, the prosecution history is particularly important because the disputed claim term "control panel" was first introduced during the prosecution. *See Iridescent Networks, Inc. v. AT&T Mobility, LLC,* 933 F.3d 1345, 1352-54 (Fed. Cir. 2019) (claim term changed during prosecution, requiring examination of file history); *Bell Comms. Research, Inc. v. Vitalink Comms. Corp.*, 55 F.3d 615, 621 (Fed. Cir. 1995) ("it is legal error to construe a claim by considering it in isolation"); *Vitronics*, 90 F.3d at 1582-83 (prosecution history "is often of critical significance in determining the meaning of the claims"). "It is well settled that a patentee may define a claim term either in the written description of the patent or, as in the present case, in the prosecution history." *Honeywell Inc. v. Victor Co. of Japan, Ltd.*, 298 F.3d 1317, 1323-24 (Fed.

36

Cir. 2002) (finding "contiguous" means in general proximity, not just in actual contact, even though common dictionary definitions required actual contact, where prosecution history evinced applicant's intent to include general proximity as well). Despite this, the district court's decision does not analyze the prosecution history in any articulated fashion, or give it any weight.

### 1. NRC admitted that the prosecution is relevant and must be considered.

Here, both parties referred to the prosecution history. (Appx11, Appx14). During the *Markman* hearing, even NRC's counsel reminded the district court that the prosecution history must be considered:

> THE COURT: Remind me. Prosecution history is extrinsic evidence?
>
> [NRC Counsel]: No. It is intrinsic evidence. It is something that is to be considered when in evidence . . . .when it's relevant, like it is here, it 100 percent needs to be considered."

(Appx1163.) Yet, the district court's decision did not analyze the prosecution history: it contains a one-sentence summary of MITE's prosecution history argument, and a one-sentence summary of NRC's prosecution history argument (Appx11, Appx14), and does not otherwise analyze or refer to what transpired during the prosecution history. This led to error, particularly since it was during the prosecution that "control

37

panel" obtains its changed meaning, different from console 30. *Iridescent,* 933 F.3d at 1352-54 (claim term changed during prosecution, requiring examination of file history); *Bell*, 55 F.3d at 621 ("it is legal error to construe a claim by considering it in isolation"); *Elekta Inst. S.A. v. O.U.R. Sc. Intern. Inc.,* 214 F.3d 1302, 1308 (Fed. Cir. 2000) ("the unambiguous language of the amended claim controls over any contradictory language in the written description").

### 2. MITE told the PTO that the Asserted Claims cover both the Figure 3 and 3A examples.

During the prosecution, MITE explained that asserted independent Claims 1, 14 and 16 recite that the "wrecker controls are located on a control panel supported by the vehicle frame" (Appx1044), and that this "support" by the vehicle frame "can constitute indirect support, such as through the use of a hinged compartment door or a sliding cabinet shelf" (Appx1044). In other words, during prosecution, MITE told the Patent Office that the wrecker controls can either be supported by a door (as in Figure 3) or by a sliding shelf (as in Figure 3A). At the time, Claims 1 and 14 each recited that the wrecker controls are "located on a control panel" and that the control panel is "moveable." (Appx551; Appx554.) Also at this time, Claim 3 recited that the wrecker controls "are located

on an outwardly-opening door" and Claim 4 recited that the "wrecker controls are located on an outwardly-sliding shelf." (Appx552.)

### 3. The Interview and Final Amendment confirm that the claims cover both Figures 3 <u>and</u> Figure 3A.

NRC incorrectly told the district court that "the asserted claims were narrowed during prosecution in ways that exclude the Figure 3A embodiment" (Appx891), and that following an interview, MITE "complied with the Examiner's suggestion" and agreed to narrow its claims to the "door" example of Figure 3, as opposed to also covering the "shelf" example of Figure 3A. (Appx439.) But that is not what happened.

During a telephonic Interview, one of the two Examiners present made various proposals, and one proposed that MITE limit its claims to a door supporting the wrecker controls and closing the compartment. (Appx748.) MITE declined this proposal, choosing instead to add different "functional" language, as also suggested during this Interview. (Appx748.) Thus, MITE revised the claims to recite that the control panel in the first (storage) position is "operable to close off the interior compartment" and that the control panel in the second (extended) position "provides an open interior compartment" with wrecker controls accessible to the operator:

39

". . . the control panel moveable from a first, storage position within the interior compartment of the vehicle body, <u>wherein the control panel in the first position is operable to close off the interior compartment from an operator of the wrecker controls</u>, to a second operable position displaced from and outside the compartment and remote from the vehicle exterior, in a direction perpendicular to the longitudinal access, <u>wherein the control panel in the second position provides an open interior compartment in which the wrecker controls are located in a position where they may be manipulated by the operator</u> . . . ."

(Appx1052.)[5]

The Claim 1 and 14 revisions in the Final Amendment recite only that it is the "control panel" that opens and closes the compartment (Appx737-45, at Appx738, Appx740-41) – not that the "control panel" is limited in any other way. Further, at the time of the Final Amendment, dependent Claim 4 was already present, and recited that the "control panel comprises an outwardly-sliding shelf." (Appx739.) Thus, the Claim 1/4 combination necessarily requires a "control panel" with a sliding shelf for carrying the wrecker controls, and a separate door for closure.

---

[5]    Two Examiners were present in the Interview. Each Examiner expressed different ideas on what would be allowable. Certainly the written history does not reveal any indication that by revising the claims in the final Amendment in the manner MITE did, that MITE was giving up coverage over Figure 3A.

40

This verbiage in the final amendment remains broad enough to cover both the Figure 3 and Figure 3A examples. As to Figure 3A, when the control panel is in the storage position, shelf 25' is withdrawn into the compartment and door 27' "closes off the interior compartment"; when the control panel is in the extended position, door 27' is open and shelf 25' is extended, providing an "open interior compartment."

NRC admitted that "Prior to the final Amendment, however, independent claim 1 remained broad enough to cover both the Figure 3 embodiment . . . and the Figure 3A embodiment . . . ." (Appx439.) The Final Amendment did not narrow the claims to the Figure 3 example, either, but continued to cover Figure 3A as well.

Further, the Notice of Allowability also supports MITE's proposed construction. (Appx750-58.) Here, the Examiners state that the Asserted Claims are allowable based on the "claimed control panel" having four features: (1) attachment to "a compartment of a wrecker-type recovery vehicle"; (2) the claimed "first and second positions"; (3) "wherein the second position is outside of an extending from the vehicle body"; and (4) "wherein the first position is inside the compartment and the control panel also <u>closes off</u> the compartment from the vehicle exterior."

41

(Appx756 (emphasis original).) None of these four features supports the district court's construction of "control panel." In fact, as to features (3) and (4), and as applied to Figure 3A, only MITE's proposed construction is supported: only a *portion* of the control panel "is outside of an[d] extending from the vehicle body" (shelf 25') , and only a *portion* of the control panel "closes off" the compartment (door 27'). In short, the Notice of Allowance also did not narrow the claims. *See DSW, Inc. v. Shoe Pavilion, Inc.* 537 F.3d 1342, 1347 (Fed. Cir. 2008) ("Neither the claim language nor the language of the examiner's statement of reasons for allowance indicate that the display method recited in claims 4-6 is constrained by the [claim limitation in question]."); *Lazare Kaplan Intern., Inc. v. Photoscribe Techn., Inc.*, 628 F.3d 1359, 1369-70 (Fed. Cir. 2010) (POSA would have understood specifications and nothing in the prosecution history suggested a narrower meaning).

### 4. The cited prior art is very different from MITE's claimed inventions.

NRC incorrectly told the district court that MITE's Remarks "state that the amendments conformed to the Examiner's [Interview] summary of what was needed to overcome the prior art rejections" (Appx440.) Instead, MITE said in its Remarks that "It was discussed that if the

claims were amended *as they now have been* . . . they would be considered as defining over the cited prior art." (Appx745 (emphasis added).)

During the prosecution of MITE's patent the principal references discussed were very different from MITE's claimed inventions. (Appx146-69 (Addleman – wrecker with *non*-moveable wrecker controls); Appx222-37 (Wilson - voter access machine for disabled persons); Appx170-211 (Schmidt – moveable control panel for a vehicle seat); Appx1407-1436, U.S. Patent 2010/0314001 (Kappel – stump cutter). MITE's arguments during prosecution show this as well. (Appx587; Appx612-13; Appx639-43; Appx671; Appx712-14.)

During the April 5, 2016 Interview, the Addleman and Kappel references were discussed, and the Examiner stated that the "amended [claim] language was descriptive and did not recite additional structure that would differentiate the claimed apparatus from the current rejection." (Appx654.) A second Interview was held on July 18, 2016. (Appx748.) During the interview MITE and the Examiners disagreed over the non-analogous nature of Wilson. (Appx748.) MITE indicated willingness to add Claim 2 to Claim 1 and to also "consider additional functional language considered by the Examiner." (Appx748.) One

Examiner said that the Addleman/Wilson combination taught "an expanded sightline when the control panel is moved," and one Examiner "suggested amending based on structural aspects of the Applicant's invention that would clearly overcome Addleman in view of Wilson, such as door 25 which supports the wrecker controls and closes the compartment." (Appx748.)

In the subsequent amendment dated July 19, 2106, after the July 18, 2016 Interview, MITE did not add the "door" language that one Examiner to the Interview had suggested. Instead, MITE added additional functional language to clarify that when the control panel is inside the compartment, it can be closed off, and when the control panel is extended outside the compartment, the compartment is open and allows an operator to manipulate the wrecker controls. (Appx737.)

In response to the July 19, 2016 Amendment, the Examiners allowed the patent application. (Appx750-58.) The Notice of Allowability states that the reason for the allowance of the Asserted Claims was their recitation of a "uniquely distinct combination of features." (Appx755-56.) The Notice of Allowability makes no distinction between the outwardly

opening door example of Figure 3 and the sliding shelf example of Figure 3A.

In short, there was no need for MITE to narrow the term "control panel" to either the "door" or "shelf" examples of Figures 3 and 3A, and MITE did not do so. The prosecution history shows that MITE clearly considered the independent Asserted Claims to be broad enough to cover both the Figure 3 and Figure 3A examples, and there was no contrary expression from the Patent Office. Certainly there was no need for MITE to limit the claims to either the Figure 3 or Figure 3A examples in light of the cited prior art, which was very different from MITE's claimed inventions. And certainly there was no disclaimer of coverage, which requires "clear and unambiguous" language. *Verizon*, 503 F.3d at 1305-06 (rejecting construction that would exclude several examples in the specification).

The district court's failure to analyze the prosecution history was error. Had it done so, it would have concluded that the prosecution history supported MITE, because it clearly shows that the claims covered both Figure 3 and Figure 3A. Construing the claims in a way that

excludes the Figure 3A embodiment – as the district court did here – is improper. *See Oatey*, 514 F.3d at 1276-77; *Verizon*, 503 F.3d at 1305.

**C.    The district court erred in finding that a "control panel" that included a separate door is inconsistent with the plain meaning of the term, because a control panel may include a separate closing portion and need not be a singular unit.**

The district court rejected MITE's proposed construction of "control panel," which allowed that it "may include a separate closing portion." (Appx7-8.) According to the district court, "defining control panel to include an entirely separate door is inconsistent with the plain meaning of the term." (Appx15.) That is incorrect, as demonstrated by both Figure 3A and common parlance.

Neither party proffered a definition for "control panel." The district court's findings appear to have been based on NRC's argument that because "control panel" is a singular noun, it must only consist of a singular item. According to NRC, "The word panel strongly suggests a single unit." (Appx445.)

But the Figure 3A example itself belies this finding, as it discloses two unattached elements (shelf 25' and door 27') that work in combination as the claimed "control panel." Both are equally important:

sliding shelf 25' both *supports* the wrecker controls and *moves* them, while separate *door* 27' *closes off* the compartment. So the Figure 3A example itself does *not* support the "singular unit" veneer that NRC and the district court applied to the term "control panel." This disclosure in the patent, and its implications, must take precedence over alleged contrary extrinsic dictionary definitions nowhere present in the patent or the record. *See Phillips*, 415 F.3d at 1320-24.

In other words, the district court failed to consider the "context" which necessarily includes "the specification and drawings." *Teleflex, Inc.*, 299 F.3d at 1326–27. As this Court has stated, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314.

There is no reason to limit "control panel" to the Figure 3 example (*i.e.,* to exclude Figure 3A) unless the Court finds that "control panel," in context, cannot refer to only a portion of the entire control panel (*i.e.,* a shelf of a shelf/door combination). The Court should not make such a finding, however, because patent claims must be interpreted based on how a POSA reading the patent would interpret them, in context.

47

*Phillips*, 415 F.3d at 1312-13. Here, the *only evidence* of that came from

Mr. Brown, who stated:

> I understand that NRC argues with reference to FIGURE 1 . . . .
> That when the door is open but the wrecker controls have not yet
> been extended outside the door, it is not known which position the
> compartment is in (i.e., the 'first' or the 'second' position) if 'control
> panel' can include (as MITE contends) both the platform on which
> the wrecker controls rest and a separate door. A POSA would not
> agree with NRC, because it is clear that NRC is reading words into
> the claims that do not appear there. Nowhere do the claims recite
> that the entire 'control panel' must be in a storage position. Instead,
> a POSA would know that . . . the location of the wrecker controls
> dictates the position of the 'control panel' (e.g., if the wrecker
> controls are outside the compartment, then the 'control panel' is in
> the second/open position).... Similarly, because the platform and
> the controls are coincident, the location of the platform dictates the
> position of the 'control panel,' and no POSA could think differently
> after reading MITE's Patent.

(Appx1017, ¶6 (citations omitted).) In other words, if the shelf/platform

carrying the wrecker controls is located outside the compartment, then

the "control panel" is in the extended/second position, *i.e.*, only a portion

of the shelf/door combination need be located outside the compartment

for the "control panel" to be in the extended position.

Finally, the notion that a singular noun must refer to a singular

unit defies plain English. There are countless everyday instances where

singular nouns cover multi-piece structures, and "control panel" as it

appears in the Figure 3A example is one such instance. Examples

48

include: "window" (a house window typically includes multiple parts, top and bottom, within a frame); "board game" (board and unattached pieces); "meal" (multiple unattached items on one or more plates); and "wireless landline telephone (consisting of a handset not attached to a base receiver). One might possibly refer to NASA's "control panel" for launching and controlling space missions; whatever that may be, it is probably not a singular unit. This Court has held that singular nouns like "portion" can cover two-piece structures when it is apparent from the specification that this is appropriate. *See Rexnord Corp.*, 274 F.3d at 1344-48. Further, NRC offered no evidence to support its argument, only attorney argument, which is not evidence. *Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.2d 1371, 1380 (Fed. Cir. 2009). Here, the context, as shown in the specification, the Figure 3A drawing itself, and the prosecution history, show that the claim term "control panel" can cover a product with both elements, shelf 25' and door 27'.

**D.    The district court erred in adopting NRC's contention that the "control panel" must be attached to or integrated with the wrecker controls.**

In its claim construction decision, the district court concluded that the "crux of [MITE's] argument is that this separate door in Figure 3A

49

must be part of the 'control panel' in this embodiment," because "[o]therwise the Figure 3A embodiment could not meet the description in the asserted independent claims, specifically citing Claim 1 for example." (Appx8.) The district court then adopted NRC's contention that "control panel" must be defined "based on 'attachment or integration with the wrecker controls.'" (Appx11.)

But the terms "attachment" or "integration" or variations of those terms do not appear anywhere in the claims in connection with "control panel."[6] While the specification says in the context of the Figure 3 example that console 30 may be "adhesively mounted, or attached using fasteners" on door 25 (Appx44, 4:38-39), with the Figure 3A example the specification says only that "shelf 25' *support[s]* console 30." (Appx45, 5:2-3; (emphasis added); *see also* Appx43, 2:6-8: ("Alternatively, for example, the wrecker controls may be located on an outwardly-sliding shelf . . . .").)

---

[6]     The term "attached" appears one time in MITE's patent, and not in the claims, to describe console 30 as "a composite material [which] may be rigidly mounted (such as adhesively mounted, or attached using fasteners) on door 25…." (Appx4, 4:36-39.) The terms "integrated," "integrate" or "integrates" appear eight times: (Appx43, 1:51, 2:17, 2:44; Appx45, 5:61; Appx46, 7:46; Appx47, 9:21, 9:24, 9:62); only one reference is to the "control panel," but it has nothing to do with any door: "[the] control panel also integrates electrical … and hydraulic …. Controls." (Appx45, 5:61-63.)

And the Asserted Claims use the broader terms "wrecker controls *located on and supported by* a control panel" (Appx46, 8:34-35; Appx47, 9:55-56, 10:28; emphasis added) – not the narrower terms of "attached or integrated." Those narrower terms are an unwarranted veneer. The district court erred in importing those terms into the claims. *See Phillips*, 415 F.3d at 1312 ("'if we once begin to include elements not mentioned in the claim, in order to limit such claim ..., we should never know where to stop'") (citation omitted).

The district court erred because it failed to consider the entire context, including the specification, drawings, and prosecution history. In both Figure 3 and Figure 3A, the control panel is "stored within an interior compartment of the wrecker" (Appx46, 8:35-36), and is also "moveable . . . to a second, operable position displaced from and outside the compartment." (Appx46, 8:41-46.) Claim 14 and Claim 16 have similar language. (Appx47, 9:55-56, 9:65-10:1, 10:28-30, 10:38-42.) For the Figure 3A example, both sliding shelf 25' and separately moveable door 27' are stored within the interior compartment when the control panel is in the first/storage position. Further, sliding shelf 27' (carrying the wrecker controls) is moveable to a "second, operable position

displaced from and outside the compartment." Since the sliding shelf is part of the "control panel," this satisfies the claim language. *See Aventis Pharm. v. Amino Chem. Ltd.*, 715 F.3d 1363, 1373-74 (Fed. Cir. 2013) (same claim term can have different meanings depending on context). As discussed above, the claim term can be construed to embody Figure 3A, and the district court erred in not doing so. *See GE Lighting*, 750 F.3d at 1311.

E.    **Dependent Claims 3 and 4 and Independent Claim 16 show that MITE's claim construction is correct.**

Both dependent Claims 3 and 4 show that independent Claim 1 necessarily covers on Figure 3A. Generally, "an independent claim should be given broader scope than a dependent claim to avoid rendering the dependent claim redundant." *Phillips*, 415 F.3d at 1324 (citation omitted). Further, the same claim term can have different meanings depending on context. *Aventis Pharm.*, 715 F.3d at 1373-74.

1. **The Claim 1/4 combination uses "control panel" to mean at least a portion of the control panel, and shows that Claim 1 covers Figure 3A, without requiring any sort of "attachment."**

Dependent Claim 4, in combination with independent Claim 1, uses "control panel" to mean at least a *portion* of the control panel. Dependent Claim 4 recites that the control panel includes an "outwardly-sliding

52

shelf" – *i.e.,* as described in Figure 3A. (*See* Appx47, 9:9-12.) A wrecker according to Claims 1 and 4, therefore, has a "control panel" that both includes an "outwardly-sliding shelf" (Claim 4) and that "is operable to close off the interior compartment." (Claim 1, Appx46, 8:43-44).

The *only* example disclosed in MITE's Patent that has these attributes is Figure 3A: shelf 25' is "outwardly-sliding" (Appx45, 5:1-3), while door 27' closes off the compartment (Appx45, 5:3-4*)*. Thus, in the Claim 1/4 combination, Claim 1's recitation that the "control panel . . . is operable to close off the interior compartment . . . ." (Appx46, 8:43-44) must refer to only an unattached *portion* of the control panel (*i.e.*, door 27'). Dependent Claim 4 therefore clearly covers Figure 3A, which means that independent Claim 1 does so as well.

NRC also argued that Claim 1 could cover a product not disclosed in MITE's Patent: "an attached drawer front that closes off the compartment in the retracted position" similar to a "filing cabinet." (Appx13-14.) According to NRC, this means dependent Claim 4 could refer to a design not covered by any of the embodiments. But NRC's argument is irrelevant. That Claims 1 or 4 may cover a "filing cabinet"-type drawer (*i.e.*, a sliding filing cabinet-type drawer with a front door

face, as shown at Appx1269), not disclosed in MITE's Patent, does not preclude a broader construction of Claims 1 and 4 that covers the "shelf" example of Figure 3A.

## 2. The Claim 1/3 combination shows that Claim 1 covers Figure 3A.

Dependent Claim 3 recites that the control panel includes an "outwardly opening door," per Figure 3. (Claim 3, Appx47, 9:5.) A wrecker according to Claims 1 and 3, therefore, has a "control panel" that both includes an "outwardly opening door" (Claim 3) and that "is operable to close off the interior compartment" (Claim 1, Appx46, 8:43-44).

The only example disclosed in MITE's Patent that has these attributes is Figure 3. But if Claim 1 were interpreted as already being limited to the Figure 3 example, as the district court has essentially done, that would render Claim 3 superfluous. *See SRI Intern. v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1122 (Fed. Cir. 1985); *Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1391 (Fed. Cir. 2016) ("A construction that would cause two differently worded claims to cover exactly the same claim scope would render one of the claims superfluous, so we apply a presumption against such constructions.").

Additionally, the district court erroneously concluded that MITE had argued that Claim 3 "read[s] on the *Figure 3A* embodiment." (Appx22 (emphasis added).) That is *not* what MITE argued. Instead, MITE consistently argued that Claim 3 covers the *Figure 3* example. (Appx807; Appx991-92, Appx998.) This error led the district court to erroneously conclude that this position supported NRC's construction (Appx22), when the opposite is true.

### 3. Independent Claim 16 uses "control panel" to mean at least a portion of the "control panel."

Like the Claim 1/4 combination, Claim 16 also uses "control panel" to mean at least a portion of the "control panel." Claim 16 recites an "outwardly-opening door" (Appx47, 10:31), as in Figure 3, while also reciting "when the control panel door is opened, the control panel is moveable" between storage and extended positions. (Appx47, 10:37-43.) When this latter language is applied to the Figure 3A example, door 27' must first be opened before shelf 25' can then be slid out. This contrasts with the Figure 3 example, where the act of opening the door automatically places the "control panel" in the extended, accessible position. In the context of Figure 3A, the second use of "control panel" here (Appx47, 10:37-43) only references the shelf, since when the door is

55

open, the *combination* of the door and shelf do not move between storage and extended positions, as the door remains open and, therefore, stored within the compartment.

### F. The district court should have considered MITE's extrinsic evidence.

#### 1. The district court improperly disregarded Mr. Brown's unrebutted declarations that showed a POSA would have understood that "control panel" covered the Figure 3A example.

While the district court should have adopted MITE's constructions based on the intrinsic evidence alone (because, *e.g.,* the Asserted Claims can be construed to cover Figure 3A), if the district court had any doubt at all, it should have considered the unrebutted declarations of MITE's expert and co-inventor, Mr. Brown, or permitted him to testify. "[E]xtrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips,* 415 F.3d at 1318. Although the decision to admit such evidence is at the district court's discretion, *id.* at 1319, here

56

it was clear error for the district court to reject MITE's contentions while ignoring the unrebutted declarations of Mr. Brown – the <u>only</u> evidence in the record that directly addresses how and why a POSA would interpret "control panel." *See Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1367 (Fed. Cir. 2022) (during claim construction "the district court erred by ignoring key evidence – unrebutted deposition testimony from Target's own expert . . . regarding how a person of ordinary skill would have understood the . . . limitations"); *Integra LifeSciences Corp. v. HyperBranch Medical Technology, Inc.*, 2017 WL 5172396, at *5 (D. Del. Nov. 8, 2017) (crediting party's unrebutted expert testimony in support of claim construction); *Vas-Cath Inc. v Mahurkar*, 935 F.2d 1555, 1567 (Fed. Cir. 1991) (expert's unrebutted declaration was "improperly disregarded").

Mr. Brown defined a POSA as a "person proficient in the electrical and hydraulic aspects of wrecker-type tow trucks, including Class A trucks. Proficiency is assumed with five (5) years of experience or more in this field." (Appx846-47, ¶10.) In his declaration, Mr. Brown, a VP of Engineering at MITE and co-inventor of MITE's Patent with decades of engineering experience at MITE (Appx843-44, ¶2), explained that "[a] POSA would have understood from reading MITE's Patent that 'control

panel' can cover products, such as the FIGURE 3A example in MITE's Patent, in which the wrecker controls are not attached to the door." (Appx847-48, ¶11.)

Mr. Brown's declarations show, among other things, that NRC's proposed constructions:

- fail to account for the "closure" function required by the MITE patent claims, as Claim 1 recites a closure function, and the door in each of Figure 3 and Figure 3A accomplishes this function (Appx847-48, ¶11); and

- require that the wrecker controls be "attached or integrated" to a singular "unit," even though this is a feature of only one preferred example (Appx39; Appx44, 4:35-40), and the patent claims are clearly broader than this, as they use the terms "located and supported" and can cover the example of Figure 3A where the shelf supports the wrecker controls and the door is not attached to the wrecker controls (Appx847-48, ¶11).

NRC also argued below that when the door is open but the wrecker controls have not yet been extended outside the door, it is not known which position the compartment is in (*i.e.,* the "first" or "second" position) if "control panel" can include both the platform on which the wrecker controls rest and a separate door. (Appx445-46.) Mr. Brown explained, however, that the claims do not recite that the *entire* "control panel" must be in a storage position, and that it would be apparent to a POSA, from context, that "because the platform [carrying the wrecker controls] and

58

the [wrecker] controls are coincident, the location of the platform dictates the position of the 'control panel,' and no POSA could think differently after reading MITE's Patent." (Appx1017, ¶6).

NRC failed to provide any expert to rebut Mr. Brown. Mr. Brown was present at the claim construction hearing, and his testimony was proffered to the district court. (Appx1102.) But the district court declined to hear Mr. Brown's testimony, and NRC chose not to examine him. The district court's failure to consider Mr. Brown's unrebutted testimony was error. *See Dyfan*, 28 F.4th at 1367.

### 2. Co-inventor Ralph McConnell's testimony does not change the plain meaning of the claims as established by the intrinsic evidence.

In briefing below, NRC improperly attempted to use select portions of the deposition testimony of one of the five inventors of MITE's Patent, Ralph McConnell, to change the plain meaning of the claims as shown in the intrinsic record. Mr. McConnell was not offered as an expert. "The testimony of an inventor 'cannot be relied on to change the meaning of the claims.'" *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983 (Fed. Cir. 1995).). That is true

whether or not the testimony is allegedly against the inventor's interest. *Id.*

NRC's reliance on these select portions of Mr. McConnell's testimony was therefore misplaced, as well as based on vague and misleading questions that lacked foundation and for which he clarified his answers later in the deposition.

Mr. McConnell initially was confused by a question asked by NRC's attorney concerning non-asserted Claim 22 that used the word "comprised." Thus, Mr. McConnell was asked in the context of Claim 22 if "Figure 3A shows a control panel comprising . . . a shelf" (Appx772a:22-Appx772:9), and he thought he was being asked to assume that the control panel *only consisted of* a shelf. (Appx1180-81.) Mr. McConnell did not realize that he did not have to make this assumption, and he did not know that "comprised" meant "including" and not (only) "consisting of." (Appx1180-81.) A continuing objection was made that these questions lacked foundation. (Appx1058.) (The district court never ruled on the objection.) As a consequence, Mr. McConnell initially testified that the term "control panel" as used in Figure 3A was synonymous with the shelf, and did not include a door (Appx449-50) – a position that makes no sense.

60

If that were the case, the claims would not cover *either* of the Figure 3 or Figure 3A examples, as in both examples a door is used to close the compartment.

During the agreed break between direct and cross, MITE's counsel explained to Mr. McConnell that he did not have to make the assumption that the control panel and shelf are different things. (Appx1181.) Mr. McConnell then clarified on both cross and re-direct examination that the term "control panel" as applied to Figure 3A includes both a shelf and a door. (Appx780-84, Appx786:23-Appx787:3.)

Regardless, Mr. McConnell's testimony cannot be used to alter the plain meaning of the claims as established by the intrinsic evidence. *Howmedica*, 540 F.3d at 1346.

### G. NRC violated claim construction rules by using the accused products in an attempt to construe the claims.

During claim construction briefing, NRC violated a basic principle of claim construction when it directly referred to its own accused products to try to construe the claims. (Appx440-41.) "It is well settled that claims may not be construed by reference to the accused device." *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002). While it may be harmless error where the district court's claim construction is

correct, here the district court's decision is not correct, and it is unclear from the district court's decision whether or to what extent it may have considered the accused products.

What is clear is that NRC violated these principles by prominently displaying photographs of the accused products in briefing, and by contending that it "avoided" Asserted Claims 1, 14, and 16. (Appx441.) NRC argued that its strategy for allegedly doing so included "keeping its movable console separate from the compartment door and by avoiding any other structure on the console that might 'close off the interior compartment' in the retracted position." (Appx441.) NRC invited the district court to commit legal error by considering these matters. In light of the district court's erroneous conclusion, it is possible that the district court was misled by NRC's improper arguments.

## II. The district court erred when it construed Disputed Terms 1 and 3-7 to exclude from the scope of "control panel" any component that is not attached to or integrated with a singular unit.

### A. The district court's construction of Disputed Terms 3-7 was infected by its erroneous construction of "control panel."

The district court believed its construction of "control panel" resolved Disputed Terms 3-7. (Appx16-24.) Accordingly, the district

court's decision regarding those terms is incorrect for all of the reasons discussed above in Section I.

**B.    The district court incorrectly rejected MITE's proposed construction for Disputed Terms 3, 6 and 7, that "at least a portion" of the "control panel" closes off the compartment.**

The district court rejected MITE's proposed construction for Disputed Term 3, that "at least a portion of the control panel in the first position blocks the operator from accessing the interior of the compartment," and held that "Miller's proposed construction adds language that does not exist in the claim." (Appx18.) The district court rejected similar proposed constructions for Disputed Terms 6 and 7. (Appx23, Appx25.) That was error.

**1.    "Control panel" can refer to a portion of the control panel when context requires.**

Had the district court not ignored Mr. Brown's unrebutted declaration, the district court would have understood that "control panel" in the claims can refer to a portion of the control panel, when the context requires.

The district court improperly imported limitations from the specification into the claims, stating:

> NRC explains that describing the door as attached to or integrated with the control panel "is consistent with the specification, which describes a control panel that is 'mounted' on the compartment door."

(Appx22.) But "mounting" is broader than attachment or integration – words which do not appear anywhere in the claims in connection with "control panel," as discussed above.

Further, the words "mount," "mounted," or "mounting" are never used in the specification in connection with Figure 3A or Claims 1, 3, 4, and 14. Those words are used in connection with Figure 3 (Appx44, 4:38; Appx46, 7:11) and elsewhere (Appx43, 1:32; Appx44, 3:63-64; Appx45, 5:11, 5:23-29; Appx48, 11:21). MITE's use of those terms elsewhere, but not in connection with Figure 3A or Claims 1, 3, 4 and 14, shows that MITE did not intend for the terms to apply, or it would have said so. *See Aventis Pharm.*, 715 F.3d at 1373-74 (same claim term can have different meanings depending on context).

### 2. The district court improperly imposed language on the claims that does not exist in the claims.

Nor did MITE's proposed constructions add language that does not exist in the claim, for all the reasons discussed above, including that singular nouns often refer to only a portion of the noun. *See, e.g., Rexnord*,

274 F.3d at 1344-48 (a "portion" may refer to multi-piece structures). In fact, MITE's proposed construction more closely tracks the claim language, as it accounts for the "support," "moveability," and "closure" functions,[7] while NRC's construction, adopted by the district court, ignores these claim requirements. MITE's construction is the only one that accurately reflects the context of the claims, including the specification, drawings (*e.g.,* Figure 3A), and prosecution history. *See Teleflex,* 299 F.3d at 1324.

Ironically, the construction adopted by the district court improperly adds language that does not exist in the claims. As discussed above, terms "attached" or "integrated" do not appear in the claims in connection with "control panel." The district court erred in importing those terms into the claims. *See Phillips,* 415 F.3d at 1312.

---

[7]    An alternative construction of "control panel" that tracks the tripartite functions perhaps better is: "A platform moveable inside and outside a vehicle compartment and on which wrecker controls are located and supported, and a closing portion for closing off an interior compartment of the vehicle, which closing portion may but need not be separate from the platform."

### 3. Claims 1/4 and 16 use "control panel" to mean at least a portion of the control panel.

Further, as discussed above, both Claims 1/4 and 16 use "control panel" to mean at least a portion of the control panel. In a Claim 1/4 wrecker, the portion of the "control panel" that operates to "close off" the compartment is door 27', shown in Figure 3A. And in a Claim 16 wrecker, the second use of "control panel" in the recited language "when the control panel door is opened, the control panel is moveable . . ."(Appx47, 10:37-43), in the context of Figure 3A, refers to only the shelf portion of the "control panel."

### 4. The district court incorrectly held that any element not "attached or integrated" with a "unit" carrying the wrecker controls cannot constitute part of the "control panel."

As discussed above, the district court erred when it held that only elements "attached or integrated" with a "unit" constitute the "control panel." (Appx7, 21-22.) The district court made that finding implicitly when it adopted NRC's proposed construction of Disputed Claim Term 1, "control panel." (Appx7 ("A unit on which controls for the wrecker are attached or integrated.").) And the district court did so explicitly later in its opinion when it discussed NRC's proposed "attachment language" in

connection with other disputed terms. (Appx21-22.) For all the reasons discussed above in Section I, the district court's importation of the terms "attached" or "integrated" into the claims resulted in error.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

WHEREFORE, MITE respectfully requests that this Court: (a) reverse the district court's entry of the *Markman* Order; (b) adopt MITE's proposed construction of Disputed Terms 1 and 3-7; (c) reverse or vacate the district court's entry of the Judgment of Non-Infringement; (d) remand for further proceedings; and (e) grant MITE such other and further relief as this Court deems just and appropriate.

Dated: August 29, 2023          Respectfully submitted,

/s/Michael P. Mazza
Michael P. Mazza
Paul R. Hale
Michael P. Mazza, LLC
686 Crescent Blvd.
Glen Ellyn, IL 60137
Phone: (630) 858-5071
Fax: (630) 282-7123

Leonard E. Hudson
The Collins Law Firm, P.C.
1770 Park Street, Suite 200
Naperville, Illinois 60563
Phone: (630) 527-7098
Fax: (630) 527-1193

*Attorneys for Appellant
Miller Industries Towing
Equipment Inc.*

## TABLE OF CONTENTS FOR APPELLANT'S
## FED. CIR. R. 28(c) ADDENDUM

| Description | Appendix Page |
|---|---|
| *Markman* Opinion, dated April 13, 2023 (ECF 100) | Appx1-31 |
| *Markman* Order, dated April 23, 2023 (ECF 101) | Appx32 |
| Final Judgment of Noninfringement, Pursuant to Fed. R. Civ. P. 54(b), and Order to Stay Defendant NRC Industries' Antitrust and Invalidity Counterclaims, dated May 18, 2023 (ECF 106) | Appx33-35 |
| Appellant MITE's Patent In Suit, U.S. Pat. No. 9,440,577 B2 (the "'577 Patent") (Vehicle Wrecker With Improved Controls) | Appx36-48 |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

MILLER INDUSTRIES TOWING
EQUIPMENT, INC.,                    Civ. No. 1:21-cv-08158-NLH-AMD

          Plaintiff,         **OPINION**

    v.

NRC INDUSTRIES,

          Defendant.

---

<u>**APPEARANCES**</u>:

KATELYN O'REILLY, ESQ.
LIZA M. WALSH, ESQ.
WILLIAM T. WALSH, JR., ESQ.
WALSH PIZZI O'REILLY FALANGA LLP
THREE GATEWAY CENTER
100 MULBERRY STREET
15TH FLOOR
NEWARK, NJ 07102

    *On behalf of Plaintiff.*

GREGORY D. MILLER, ESQ.
GENE Y. KANG, ESQ.
RIVKIN RADLER LLP
25 MAIN STREET, SUITE 501
COURT PLAZA NORTH
HACKENSACK, NJ 07601

    *On behalf of Defendant.*

<u>**HILLMAN**</u>, **District Judge**

    Before the Court is a dispute over the construction of

claims relating to U.S. Patent No. 9,440,577 (the "'577

Patent"). This Opinion formally memorializes the Court's
findings as to its construction of the patent claims at issue
pursuant to <u>Markman v. Westview Instruments, Inc</u>., 517 U.S. 370
(1996).

**I.    BACKGROUND**

    **A. The '577 Patent**

Plaintiff, Miller Industries Towing Equipment, Inc.
("Miller") is the owner of the '577 Patent. (ECF 1-5 at 2).
The '577 Patent is entitled Vehicle Wrecker With Improved
Controls. (Id.) The '577 Patent relates to large tow trucks or
"wreckers." (ECF 80 at 1). The '577 Patent includes twenty-two
claims, comprising four independent and eighteen dependent
claims. (ECF 1-5 at 12–14).

The Patent includes six drawing sheets. (ECF 1-5 at 2–8).
Figure 1 depicts prior art. (Id. at 3). Figures 2, 3, and 4
all depict one embodiment. (Id. at 4–5, 7). More specifically,
Figure 3 "is an enlarged top and side perspective view of the
side tool box and wrecker controls." (Id. at 5, 10). Figure 3A
depicts a second embodiment, with a similar view as the Figure 3
drawing. (Id. at 6, 10). Finally, Figure 5 depicts "a top,
schematic view of a preferred embodiment." (Id. at 10). The
patent's description of the embodiments describes Figure 3 and
Figure 3A in relevant part as follows:

2

Appx0002

> Referring now to FIG. 3, outwardly-opening
> door 25 of wrecker side tool box 24 is
> shown. A console 30 such as a console made
> of a composite material, may be rigidly
> mounted (such as adhesively mounted, or
> attached using fasteners) on door 25, as
> shown. Console 30 may support wrecker
> controls generally designated as 31.
> . . .
>
> Referring to FIG. 3A, an alternative
> embodiment of side toolbox 24' is shown
> utilizing a shelf 25' supporting console 30
> which slides in and out of toolbox 24', and
> an upper door 27' which can close the
> toolbox from the top.

A key distinction between the two embodiments is that Figure 3 includes an "outwardly-opening door" with a mounted console and wrecker controls, whereas Figure 3A includes a shelf upon which the console is supported.

### B. Procedural History

On April 5, 2021, Plaintiff filed its Complaint against defendant, NRC Industries ("NRC" or "Defendant") for patent infringement. (ECF 1). Miller asserts that that certain of NRC's wrecker models infringe claims 1-3, 6, 11, 16, and 20-21 of the '577 Patent. (ECF 1 at ¶ 9). On February 4, 2022, NRC filed its Answer and Counterclaims. (ECF 42).

The Parties filed a Joint Claim Construction and Prehearing Statement on July 1, 2022, setting out the disputed terms as well as agreed upon terms. (ECF 80). On August 15, 2022, the Parties filed their respective Opening Briefs. (ECF 85, NRC

Appx0003

Opening Brief; ECF 86, Miller Opening Brief).  On September 16, 2022, the Parties filed their responses.  (ECF 89, NRC Response; ECF 90, Miller Response).  Following briefing, this Court held a claim construction hearing on March 8, 2023.  (ECF 97).

## II.  LEGAL STANDARD

Claim construction is "an issue for the judge, not the jury."  Markman v. Westview Instruments, Inc., 517 U.S. 370, 391 (1996); see also Teva Pharms. USA, Inc. v. Sandoz, Inc., 574 U.S. 318, 332 (2015) ("This ultimate interpretation is a legal conclusion.").  "[T]he words of a claim 'are generally given their ordinary and customary meaning.'"  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art [the "POSA"] in question at the time of the invention."  Id. at 1313.  Claim construction begins with the intrinsic evidence of the patent--the claims, the specification, and the prosecution history--and may require consultation of extrinsic evidence to understand the state of the art during the relevant time period.  Teva Pharms. USA, Inc., 574 U.S. at 331–32.

"Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and

4

Appx0004

inventor testimony, dictionaries, and learned treatises."
Markman, 52 F.3d at 980.  However, "[i]n those cases where the
public record unambiguously describes the scope of the patented
invention, reliance on any extrinsic evidence is improper."
Vitronics Corp., 90 F.3d at 1583.  "When an analysis of
*intrinsic* evidence resolves any ambiguity in a disputed claim
term, it is improper to rely on extrinsic evidence to contradict
the meaning so ascertained."  Intel Corp. v. VIA Techs., Inc.,
319 F.3d 1357, 1367 (Fed. Cir. 2003) (emphasis in original).
"Extrinsic evidence . . . cannot be used to alter a claim
construction dictated by a proper analysis of the intrinsic
evidence."  On-Line Tech. v. Bodenseewerk Perkin-Elmer, 386 F.3d
1133, 1139 (Fed. Cir. 2004) (citations omitted).

As part of construing claims, the Court can assess whether
a claim term is indefinite, and reach "'a legal conclusion that
is drawn from the court's performance of its duty as the
construer of patent claims.'"  In re Aoyama, 656 F.3d 1293, 1299
(Fed. Cir. 2011) (quoting Personalized Media Commc'ns, L.L.C. v.
Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998)).  For a
claim term to be definite under 35 U.S.C. § 112 (2012), "a
patent's claims, viewed in the light of the specification and
prosecution history, [must] inform those skilled in the art
about the scope of the invention with reasonable certainty."
Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 909

(2014).

It is permissible to "read in" testing conditions from the specification without violating the basic canon of construction not to import limitations from the specification into the claims, but only where this will "reconcile[ ] the ambiguous claim language with the inventor's disclosure." Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1378-79 (Fed. Cir. 2005). Where, however, the specification discloses multiple methods for evaluating a claim limitation without guidance to a person of ordinary skill in the art about which method to use, the claim limitation is indefinite. Dow Chem. Co. v. Nova Chems. Corp. (Can.), 803 F.3d 620, 634-35 (Fed. Cir. 2015); Teva Pharms. USA, Inc. v. Sandoz, Inc., 789 F.3d 1335, 1344-45 (Fed. Cir. 2015), on remand from 574 U.S. 318 (2015).

### III. AGREED-UPON TERMS

The Parties initially agreed upon the construction of three terms, as set out in their Joint Claim Construction and Prehearing Statement. (ECF 80 at 2). The Parties later agreed upon what was previously Disputed Term 2. (ECF 84 at 1). The agreed upon terms have been construed by the Parties as follows.

| Term | Agreed-Upon Construction |
|---|---|
| "the wrecker controls comprise integrated electrical and hydraulic controls located on a single console"<br><br>(Claims 8, 14) | Plain and ordinary meaning in view of the claims, specification, and prosecution history. |

6

| | The plain and ordinary meaning means: The wrecker controls include both electrical and hydraulic controls located on the control panel. |
|---|---|
| "CAN bus" (Claims 5 and 14) | A network of components that communicate using a vehicle bus standard application that allows microcontrollers and devices to communicate with each other within a vehicle. |
| "CAN controller" (Claims 5 and 14) | A component associated with devices on the CAN bus (such as a sensor, actuator, or other control device) that controls the sending and receiving of messages on the CAN bus. |
| "supported by" (Claims 1, 14, and 16) | "directly or indirectly having its weight borne by" |

## IV.  DISPUTED TERMS[1]

The Court has considered the Parties' positions on their proposed construction of the disputed terms as presented in their comprehensive briefs and at oral argument at the <u>Markman</u> hearing.  Accordingly, the Court construes the claim-terms as follows.

### A. Disputed Term 1: "control panel"

| Claim Term | Miller's Proposed Construction | NRC's Proposed Construction |
|---|---|---|
| "control panel" (Claims 1-3, 14, 16, 21) | "A platform on which wrecker controls are located and supported, and may also include a separate closing | "A unit on which controls for the wrecker are attached or integrated." |

[1] The Parties' respective proposed constructions are set out in their Joint Claim Construction and Prehearing Statement (ECF 80 at 3-6), with revisions in a letter to the Court (ECF at 84).

Appx0007

| | portion for closing off an interior compartment of the vehicle." | |
|---|---|---|

In support of its construction, Miller asserts that the claim term "control panel," as used in asserted claims 1-3, 14, 16, and 21, is broad enough to include both the embodiment in Figure 3 and in Figure 3A of the patent.  (ECF 86 at 16).  It explains that only Miller's proposed construction covers both embodiments.  (Id.).

In the Figure 3 "a side compartment 24 has an outwardly opening door 25 that *both* closes off the compartment and carries the wrecker controls 30."  (ECF 86 at 16-17 (emphasis in original)).  On the other hand, in Figure 3A "an upper door 27' is used to close off the compartment, while a *separate* sliding shelf 25' – unattached to the door – carries the wrecker controls 30."  (Id. at 17 (emphasis in original)).  This "upper door" comes down like a garage door, to fully close off access to the wrecker controls and the compartment they are stored in.  (ECF 99 at 31:17-19).  The crux of Miller's argument is that this separate door in Figure 3A must be part of the "control panel" in this embodiment.  (ECF 86 at 18).  Otherwise, the Figure 3A embodiment could not meet the description in the asserted independent claims, specifically citing independent Claim 1 for example.  (Id. at 16).  Claim 1 claims:

Appx0008

1.   A wrecker-type recovery vehicle for recovering other disabled vehicles, comprising:

    a vehicle frame extending along a longitudinal axis, the vehicle frame supporting a vehicle body and carrying an extendable and retractable boom; and

    manually-manipulable wrecker controls located on and supported by a control panel stored within an interior compartment of the wrecker supported by the vehicle body, the wrecker controls configured to control movement of one or more wrecker components useful in vehicle recovery, wherein the control panel has a base end and a distal end opposite the base end; and

    the control panel moveable from a first, storage position within the interior compartment of the vehicle body, wherein the control panel in the first position ***is operable to close off the interior compartment*** from an operator of the wrecker controls, to a second, operable position displaced from and outside the compartment and remote form the vehicle exterior, in a direction perpendicular to the longitudinal axis, wherein the control panel in the second position provides an open interior compartment in which the wrecker controls are located in a position where they may be manipulated by the operator, and wherein in the second position the control panel is downwardly-angled relative to ground such that the distal end is located remote from the vehicle body and below a horizontal axis parallel to ground and intersecting the base end, and wherein the control panel remains supported by the vehicle body while in the second position, whereby the displacement of the control panel to

> the second position comprises a
> strategic location of the wrecker
> controls, providing an operator with an
> ergonomically-enhanced work surface.

(ECF 1-5 at 12 (emphasis added)).  Miller explains that this

claim requires the control panel to be "operable to close off

the interior compartment."  (ECF 86 at 16 (quoting the '577

Patent)).  Thus, looking to Figure 3A, Miller concludes that the

separate door must be part of the "control panel," as it is the

mechanism that closes off the interior compartment.  (Id. at

18).  Specifically, Miller states that ""control panel" must be

broad enough to include both the supportive console the wrecker

controls rest on (such as the shelf of FIGURE 3A (*see* Ex. A)),

as well as a closing element."  (Id. at 20).  Miller asserts

that "NRC's proposed construction includes limitations" and

"would exclude the FIGURE 3A example from claim coverage."  (Id.

at 17, 20).  It contends that "[r]arely, if ever" will a

construction that excludes the disclosed embodiments be correct.

(Id. at 17 (citing Vitronics Corp., 90 F.3d at 1583)).

Moreover, Miller asserts that review of dependent claims

instructs that control panel as used in claim 1 must be broad

enough to cover both controls on a door as well as controls on a

shelf.  (Id. at 18).  It explains that "[i]f dependent claims

are directed to specific features, their independent claim

should not be limited to those features; otherwise, the

10

dependent claims would be rendered superfluous and unnecessary."
(Id.).  Miller points out that claim 1 does not require the
control panels to be on a door.  (See Id.).  Further, dependent
claim 3 "recites that the control panel includes an outwardly-
opening door" whereas dependent claim 4 "recites that the
control panel includes a sliding shelf."  (Id. at 18).  Miller
argues that NRC's construction limits claim 1 to wrecker
controls on a door, which it asserts is undermined by the
distinction between claims 1, 3, and 4.  It argues that NRC's
construction "would render Claim 3 superfluous, while nullifying
Claim 4."  (Id. at 19).

Finally, Miller claims that the prosecution history
supports its construction because there is nothing in the
prosecution history that limits the claims, while NRC's
construction would.  (Id. at 18).

NRC argues that control panel should be construed
"[c]onsistent with the plain and ordinary meaning."  (ECF 85 at
12).  NRC explains that defining the control panel based on
"attachment or integration with the wrecker controls" is
supported by the claim language.  (Id. at 13).  Specifically, it
is "consistent with the claim requirement that the control panel
is 'stored within an interior compartment of the wrecker'" and
that the "control panel is moveable 'to a second, operable
position displaced from and outside the compartment.'"  (Id.).

11

Appx0011

NRC avers that its proposed construction is supported by
the canon of claim differentiation. (Id. at 15). NRC explains
that the distinction between claim 1 and claim 22 undermines
Miller's proposed construction, stating that "Claim 22 requires
'a control panel' and 'a door separate from the control panel.'
If, as Miller asserts, 'control panel' can include a door that
is separate from and moves independently of the structure on
which the controls are mounted, it is unclear what claim 22's
'door separate from the control panel' would cover." (Id.).
Accordingly, NRC argues that the embodiment in Figure 3A is not
covered by asserted independent claims 1, 14, and 16, but
instead is covered by non-asserted independent claim 22, which
requires "a control panel" and "a door separate from the control
panel." (Id.). NRC's position is that "if the structure for
closing the compartment is 'attached to' the wrecker controls
then it forms part of the control panel (as required by
independent claims 1, 14, and 16). If the door is separate from
the wrecker controls (as in claim 22), it is not part of the
control panel." (Id.).

NRC disputes Miller's argument that the asserted
independent claims cover the Figure 3A embodiment. NRC argues
that Miller is incorrect in arguing that "the law prohibits the
Court from construing independent claims 1, 14, and 16 in a
manner that would exclude one of the disclosed embodiments from

12

Appx0012

the scope of those claims." (ECF 89 at 6). Rather, NRC explains that "[t]he law is clear that all claims do not need to cover all examples or embodiments described in the specification." (Id. (citing Baran v. Med. Device Techs., Inc., 616 F.3d 1309, 1316 (Fed. Cir. 2010) ("It is not necessary that each claim read on every embodiment"); PPC Broadband, Inc. v. Corning Optical Communs. RF, LLC, 815 F.3d 747, 755 (Fed. Cir. 2016) ("This does not mean, however, that each and every claim ought to be interpreted to cover each and every embodiment"); Intamin, Ltd. v. Magnetar Techs., Corp., 483 F.3d 1328, 1337 (Fed. Cir. 2007) ("[T]his court has acknowledged that a claim need not cover all embodiments.")).

NRC disputes Miller's claim differentiation argument. Contrary to Miller's characterization, NRC explains that its proposed construction does not limit claim 1 to wrecker controls on a door. (ECF 89 at 11). NRC explains that "claims can be broader than the preferred embodiments." (ECF 85 at 20-21 (citing Phillips, 415 F.3d at 1323.). Thus, NRC explains that claim 1 can include a design with the control panel consisting of wrecker controls on a shelf, but maintains that Figure 3A does not show this design. (ECF 89 at 11). Instead, NRC explains that in addition to a door as shown in Figure 3, a design under claim 1 "could also be an attached drawer 'front' that closes off the compartment in the retracted position

13

(similar to a common filing cabinet drawer)."  (Id.).  Thus, NRC explains that dependent claim 4 may refer to a design that is not covered by any of the embodiments.

In addition to the claim language, NRC points to the specification in support of its construction.  (ECF 85 at 15–16).  NRC explains that "[t]here is not a single instance in the specification of the '577 patent where a separately operable structure (such as an independent compartment door) is referred to as part of the 'control panel.'"  (Id. at 16).  NRC points out that while the door in Figure 3 is labeled as 25 and the shelf in Figure 3A is labeled 25', the door in Figure 3A is labeled 27'.  (Id.).  Thus, NRC concludes "the patentee viewed physical attachment as the feature that makes a structure part of the control panel—not 'support,' 'location,' or ability to close the compartment."  (Id.).

NRC also refers to the prosecution history, and explains that throughout the prosecution history, Miller was required to narrow independent claims 1, 14, and 16 to "overcome the cited prior art by adding language to the first three independent claims requiring that the ***control panel*** (as opposed to some other structure) be operable to close off the interior compartment."  (Id.).

We do not reach that parties' arguments as to extrinsic evidence, as the intrinsic evidence is sufficient to support construction.  See Vitronics Corp., 90 F.3d at 1583.

Based on the language of the claims, this Court adopts NRC's proposed construction.  This Court finds that defining control panel to include an entirely separate door is inconsistent with the plain meaning of the term.  While Miller is correct that a construction that excludes an embodiment is rarely correct, an embodiment need not be covered by each independent claim.  Baran v. Med. Device Techs., Inc., 616 F.3d 1309, 1316 (Fed. Cir. 2010) ("It is not necessary that each claim read on every embodiment.").  Moreover, "[i]t is often the case that different claims are directed to and cover different disclosed embodiments."  Helmsderfer v. Bobrick Washroom Equip., Inc., 527 F.3d 1379, 1383 (Fed. Cir. 2008).  Therefore, it is sufficient that one independent claim reads on the Figure 3A embodiment.  Unasserted, independent claim 22 clearly covers the Figure 3A embodiment, describing a "control panel comprising an outwardly sliding shelf" and "a door separate from the control panel."  (ECF 1-5 at 14).  Claim 22 specifically describes a design like that in Figure 3A where the control panel and the unit used for "closing and opening the interior compartment" are separate.  (Id.).  Thus, construing "control panel" to not include the closing structure in all embodiments and designs is

15

Appx0015

consistent with the canon of claim differentiation--claim 1 includes a control panel that closes off the control storage compartment, whereas claim 22 includes a control panel and separate closing structure.  <u>See</u> <u>Comark Commc'ns, Inc. v. Harris Corp.</u>, 156 F.3d 1182, 1187 (Fed. Cir. 1998) ("While we recognize that the doctrine of claim differentiation is not a hard and fast rule of construction, it does create a presumption that each claim in a patent has a different scope.").

Further, this Court is unpersuaded by Miller's stated concerns that this construction limits claim 1 to include a door.  While claim 1 only reads on the Figure 3 embodiment, not the Figure 3A embodiment, a claim may be broader than any of the embodiments.  <u>See</u> <u>Metrologic Instruments, Inc. v. Symbol Techs., Inc.</u>, 460 F. Supp. 2d 571, 608 (D.N.J. 2006) ("a preferred embodiment may be narrower than the claim or claims to which it corresponds").  As such, the fact that claim 1 is not limited to a control panel consisting of a door does not require an interpretation that fits the Figure 3A embodiment into the claim 1 language.

Based on the claim language and intrinsic evidence, "control panel" will be defined as "a unit on which controls for the wrecker are attached or integrated."

**B. Disputed Term 3: "wherein the control panel in the first position is operable to close off the interior compartment from an operator of the wrecker controls"**

Appx0016

| Claim Term | Miller's Proposed Construction | NRC's Proposed Construction |
|---|---|---|
| "wherein the control panel in the first position is operable to close off the interior compartment from an operator of the wrecker controls"<br><br>(Claim 1) | Plain and ordinary meaning in view of the claims, specification, and prosecution history.<br><br>The plain and ordinary meaning means: "at least a portion of the control panel in the first position blocks the operator from accessing the interior of the compartment." | See construction of "control panel."<br><br>"Movement of the control panel to the first position (as opposed to movement of some other component not attached to or integral with the control panel) blocks the operator from accessing the inside of the interior compartment." |

Miller explains that consistent with its proposed construction of "control panel," its proposed construction of Disputed Term 3 includes both the Figure 3 embodiment "where the control panel is the door" as well as the Figure 3A embodiment "in which a portion of the control panel is the door, while a remaining portion of the control panel – a shelf – carries the wrecker controls."  (ECF 86 at 22).

NRC counters that "[b]ecause the control panel is **a singular unit** on which the wrecker controls are mounted or integrated, it is movement of the control panel to the first position that 'closes off the compartment,' not movement of some other component that is neither attached to or integral with control panel."  (ECF 85 at 25 (emphasis in original)).  NRC claims that Miller does not point to any evidence in support of

17

Appx0017

its construction of this claim, and fails to identify any support for its position that it is sufficient for "at least a portion" of the control panel to satisfy the requirements of the claim." (ECF 89 at 15–16).

Construction of the "control panel" claim informs construction of this claim. It is fundamental that while engaging in claim construction, "courts may not redraft claims." United Therapeutics Corp. v. Sandoz, Inc., No. 3:12-CV-01617, 2013 WL 3223384, at *9 (D.N.J. June 25, 2013) (finding that a proposed construction that "essentially adds limitations to the claim . . . "violates the fundamental claim construction rule that 'courts may not redraft claims'"). Miller's proposed construction adds language that does not exist in the claim. Its proposed construction thus asks this Court to redraft to claim to expand its meaning. Such a construction is improper. See Beacon Adhesives, Inc. v. United States, 134 Fed. Cl. 26, 39 (2017) (rejecting a proposed construction that "erroneously expands the scope of the term beyond the clear meaning in the specification"); Sepracor Inc. v. Dey, L.P., 590 F. Supp. 2d 649, 654 (D. Del. 2008) (rejecting a proposed construction as "attempting to improperly expand the scope of its claims").

Consistent with this Court's construction of "control panel," this Court adopts NRC's proposed construction of Disputed Term 3. As such, "wherein the control panel in the

18

Appx0018

first position is operable to close of the interior compartment

from an operator of the wrecker controls" will be defined as

"movement of the control panel to the first position (as opposed

to movement of some other component not attached to or integral

with the control panel) blocks the operator from accessing the

inside of the interior compartment."

   **C. Disputed Term 4: "wherein the control panel in the
   second position provides an open interior compartment
   in which the wrecker controls are located in a
   position where they may be manipulated by the
   operator"**

| Claim Term | Miller's Proposed Construction | NRC's Proposed Construction |
|---|---|---|
| "wherein the control panel in the second position provides an open interior compartment in which the wrecker controls are located in a position where they may be manipulated by the operator"<br><br>(Claim 1) | Plain and ordinary meaning in view of the claims, specification, and prosecution history.<br><br>The plain and ordinary meaning means: "The control panel in the second position provides an open interior compartment granting the operator access to the wrecker controls located on the control panel." | See construction of "control panel."<br><br>"Movement of the control panel to the second position (as opposed to movement of some other component not attached to or integral with the control panel) opens the interior compartment and provides operator access to the wrecker controls located on the control panel." |

   In discussing both Disputed Terms 4 and 7, Miller argues

that "given that the 'control panel' can include both the door

and the platform for [Miller's] construction, when the 'control

panel' is in the 'second' (outside the compartment) position,

only [Miller's] construction allows the 'control panel' to

provide an open compartment, providing the operator with access to its interior." (ECF 86 at 23).

NRC urges that "it is movement of the control panel to the second position that provides the operator access to 'manipulate the controls,' not movement of some other component that is neither attached to or integral with control panel." (ECF 85 at 25).

Again, consistent with the above construction of control panel and the conclusion that claim 1 does not read on the Figure 3A embodiment, this Court adopts NRC's construction here. Therefore, "wherein the control panel in the second position provides an open interior compartment in which the wrecker controls are located in a position where they may be manipulated by the operator" will be construed as "movement of the control panel to the second position (as opposed to movement of some other component not attached to or integral with the control panel) opens the interior compartment and provides operator access to the wrecker controls located on the control panel."

### D. Disputed Term 5: "wherein control panel comprises an outwardly-opening door associated with a compartment accessible from an exterior of the vehicle"

| Claim Term | Miller's Proposed Construction | NRC's Proposed Construction |
|---|---|---|
| "wherein control panel comprises an outwardly-opening door | Plain and ordinary meaning in view of the claims, specification, | "The control panel has a door attached to or integral with it that is accessible from outside the vehicle |

Appx0020

| associated with a compartment accessible from an exterior of the vehicle" (Claim 3) | and prosecution history. The plain and ordinary meaning means: "The control panel includes an outwardly-opening door that provides access to the operator from the outside of the vehicle." | and that opens outwardly to provide access to the compartment in which the control panel is located." |
|---|---|---|

In support of its construction of Disputed Term 5, Miller points to its proposed construction of "control panel" and explains that only Miller's construction includes "a version of the invention in which a door does not carry the wrecker controls" as demonstrated in the Figure 3A embodiment. (ECF 86 at 24). Thus, although dependent claim 3 expressly recites a door, Miller takes issue with the "attachment" language. (Id.; ECF 90 at 17). It alleges that where the specification "states that 'console 30' is 'mounted' on the door," console 30 is not synonymous with "control panel." (ECF 90 at 17). Moreover, it states that this specification language only focuses on the Figure 3 embodiment, and as such does not provide support for NRC's argument that where a door is part of a control panel it must be attached. (Id.).

NRC's position is that "[f]or the same reasons set forth above with respect to NRC's construction of the term 'control panel,' . . . the 'control panel' is a unit on which controls for the wrecker are attached or integrated." (ECF 85 at 23).

NRC explains that describing the door as attached to or integrated with the control panel "is consistent with the specification, which describes a control panel that is 'mounted' on the compartment door." (Id.).

Again, for the reasons expressed above, this Court adopts NRC's proposed construction. Contrary to Miller's urging, dependent claim 3 does not read on the Figure 3A embodiment. Thus, Miller's distinction that the specification is referring to the embodiment in Figure 3 when it describes console 30 as "mounted" on the door supports, rather than undermines, NRC's proposed construction. Accordingly, "wherein control panel comprises an outwardly-opening door associated with a compartment accessible from an exterior of the vehicle" will be defined as "the control panel has a door attached to or integral with it that is accessible from outside the vehicle and that opens outwardly to provide access to the compartment in which the control panel is located."

### E. Disputed Term 6: "wherein the control panel is moveable from a first, storage position, thereby closing the interior compartment"

| Claim Term | Miller's Proposed Construction | NRC's Proposed Construction |
|---|---|---|
| "wherein the control panel is moveable from a first, storage position, thereby | Plain and ordinary meaning in view of the claims, specification, and prosecution history. | "Movement of the control panel to the first position inside the compartment (as opposed to movement of some other component not attached to or |

22

| closing the interior compartment"  (Claim 14) | The plain and ordinary meaning means: "Movement of at least a portion of the control panel blocks access to the inside of the compartment." | integral with the control panel) blocks access to the inside of the compartment." |
|---|---|---|

In support of its construction, Miller explains that "Term No. 6 recites that the 'control panel' closes the compartment, and Miller's Patent discloses a door to accomplish this." (ECF 86 at 24). In addition, Miller admits that "[t]he term 'thereby' in Term No. 6 might suggest that movement from the storage to the extended position 'automatically' results in door closure" but instead "proposes that 'thereby' be construed as permitting closure to occur." (Id.). To this end, Miller edited its proposed construction in its Miller's Opening Brief, as follows: "movement of at least a portion of the control panel [permits] block[ed]s access to the inside of the compartment." (Id. at 24).

NRC claims that the language in Disputed Term 6 describes a "unitary movement" where movement from the extended position to the storage position automatically closes the door. (ECF 89 at 16). NRC asserts that in asking this court to construe Disputed Term 6 as "permitting" rather than "requiring" closure, "Miller asks the Court to rewrite the claim language." (Id.). NRC also points out that Miller did not actually include this "permitting" language in its proposed construction, but is

asking the Court now in its briefing to add this language in. (Id.).

This Court finds that Miller's proposed construction expands the claim language and as such is inconsistent with the plain meaning. See Beacon Adhesives, Inc., 134 Fed. Cl. at 39; Sepracor Inc., 590 F. Supp. 2d at 654. NRC's proposed construction is consistent with the above adopted construction of control panel, and this Court therefore adopts NRC's proposed construction. "Wherein the control panel is moveable from a first, storage position, thereby closing the interior compartment" will be construed as "movement of the control panel to the first position inside the compartment (as opposed to movement of some other component not attached to or integral with the control panel) blocks access to the inside of the compartment."

**F. Disputed Term 7: "to a second, operable position displaced from and outside the compartment, thereby opening the interior compartment so that the operator can manipulate the wrecker controls"**

| Claim Term | Miller's Proposed Construction | NRC's Proposed Construction |
|---|---|---|
| "to a second, operable position displaced from and outside the compartment, thereby opening the interior | Plain and ordinary meaning in view of the claims, specification, and prosecution history.<br><br>The plain and ordinary meaning means: "When the control panel is in the second operable | "Movement of the control panel to the second position outside the compartment (as opposed to movement of some other component not attached to or integral with the control panel) opens |

24

| | | |
|---|---|---|
| compartment so that the operator can manipulate the wrecker controls"<br><br>(Claim 14) | position, at least a portion of the control panel resides outside the compartment and provides the operator with access to the wrecker controls." | the compartment and provides operator access to the wrecker controls on the control panel." |

Both Parties present the same arguments for Disputed Claim 7 as set out in Disputed Claim 4. Thus, for the same reasons discussed related to Disputed Claim 4 above, this Court adopts NRC's proposed construction. Therefore, "to a second, operable position displaced from and outside the compartment, thereby opening the interior compartment so that the operator can manipulate the wrecker controls" will be defined as "Movement of the control panel to the second position outside the compartment (as opposed to movement of some other component not attached to or integral with the control panel) opens the compartment and provides operator access to the wrecker controls on the control panel."

### G. Disputed Term 8: "the control panel comprising an outwardly-opening door associated with the interior compartment accessible from an exterior of the vehicle"

| Claim Term | Miller's Proposed Construction | NRC's Proposed Construction |
|---|---|---|
| "the control panel comprising an outwardly-opening door associated with the | Plain and ordinary meaning in view of the claims, specification, and prosecution history. | "The control panel has a door attached to or integral with it that is accessible from outside the vehicle and that opens outwardly to provide |

| interior compartment accessible from an exterior of the vehicle" (Claim 16) | The plain and ordinary meaning means: "The control panel includes an outwardly-opening door that is accessible from outside the vehicle to provide access to the operator." | access to the compartment in which the control panel is located." |
|---|---|---|

Both parties set out the same arguments with respect to Disputed Term 8 as they do for Disputed Term 5 discussed above. However, upon reviewing the proposed constructions for Disputed Term 8, Miller's proposed construction more closely aligns with the constructions we have adopted throughout this analysis, specifically the definition of control panel as "[a] unit on which controls for the wrecker are attached or integrated." NRC's construction here seems to define the control panel as a unit that is attached to a door, whereas this Court's constructions throughout have defined the control panel to include the attached supporting structure that holds and supports the wrecker controls. Thus, this Court adopts Miller's proposed construction. Therefore, "the control panel comprising an outwardly-opening door associated with the interior compartment accessible from an exterior of the vehicle" will be defined as "the control panel includes an outwardly-opening door that is accessible from outside the vehicle to provide access to the operator."

**H. Disputed Terms 9 through 13**

26

| Claim Term | Miller's Proposed Construction | NRC's Proposed Construction |
|---|---|---|
| "strategic location" (Claims 1, 14, 16) | Plain and ordinary meaning in view of the claims, specification, and prosecution history. The plain and ordinary meaning means: "A location that provides a particular purpose or advantage." | Indefinite |
| "ergonomically-enhanced work surface" (Claims 1, 14, 16) | Plain and ordinary meaning in view of the claims, specification, and prosecution history. The plain and ordinary meaning means: "A work surface that relates to or is designed for efficiency and comfort in the working environment." | Indefinite |
| "substantially expanded sightlines" (Claims 2 and 16) | Plain and ordinary meaning in view of the claims, specification, and prosecution history. The plain and ordinary meaning means: "Sightlines that are considerably, materially or meaningfully enhanced." | Indefinite |
| "the distance that the wrecker controls are located from the side surface of the vehicle | Plain and ordinary meaning in view of the claims, specification, and prosecution history. The plain and ordinary meaning means: "A | Indefinite |

Appx0027

| | | |
|---|---|---|
| exterior when the control panel is moved to a second position is about 1-2 feet" (Claim 2) | distance measured from the outside surface of the vehicle, perpendicular to the vehicle, to the furthest extent of the wrecker controls away from the vehicle." | |
| "the wrecker controls comprise integrated electrical and hydraulic controls, each of which are located on a pair of consoles" (Claim 9) | Plain and ordinary meaning in view of the claims, specification, and prosecution history.<br><br>The plain and ordinary meaning means: "The wrecker controls include both electrical and hydraulic controls located on control panels." | Indefinite |

NRC disputes terms 9 through 13 as indefinite. NRC argues that "[c]ompetitors are entitled to know the scope of the claims with reasonable certainty. These three claim terms fail to provide that notice function, as they each implicate a variety of subjective factors that vary from person to person." (ECF 85 at 4). NRC does not propose alternate constructions to Miller's. At the Markman hearing, NRC represented that if this Court determines that it will not rule on the issue of indefiniteness at this stage, then it would accept Miller's construction on these terms at this stage with a reservation of their right to assert indefiniteness at the summary judgment stage. (ECF 99 at 96:2-25).

There are several important factors that caution courts

against deciding indefiniteness prior to summary judgment.

First, indefiniteness is proven by "clear and convincing

evidence" where a patent's "claims, read in light of the

specification delineating the patent, and the prosecution

history, fail to inform, with reasonable certainty, those

skilled in the art about the scope of the invention." Nautilus,

Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014);

Microsoft Corp. v. I4I Ltd. P'ship, 564 U.S. 91, 95 (2011).

This is a high burden of proof that would be difficult to meet

at this early stage. Second, expert testimony may be helpful in

this task. Phillips, 415 F.3d at 1318. Third, "the purpose of

a *Markman* hearing is for the court and the parties to settle

conclusively on the interpretation of disputed claims, Novartis

Corp. v. Teva Pharms. USA, Inc., 565 F. Supp. 2d 595, 603

(D.N.J. 2008), whereas indefiniteness invalidates the patent

claims entirely. Nautilus, Inc., 572 U.S. at 902 ("A lack of

definiteness renders invalid 'the patent or any claim in

suit.'"). Thus, the Court may defer the indefiniteness

arguments until summary judgment. Ultimately, "[w]hether to

decide the issue of invalidity based on indefiniteness at the

claim construction stage depends on the particular circumstances

and claims at issue in a given case, and is a matter within a

court's discretion." Junker v. Med. Components, Inc., No. CV

13-4606, 2017 WL 4922291, at *2 (E.D. Pa. Oct. 31, 2017).

Appx0029

This Court will defer the issue of indefiniteness to the summary judgment stage. Therefore, this Court will construe these terms according to Miller's proposed constructions at this stage. Thus, disputed terms 9 through 13 will be construed as follows:

| Disputed Term | Construction |
|---|---|
| Disputed Term 9: "strategic location" | "A location that provides a particular purpose or advantage." |
| Disputed Term 10: "ergonomically enhanced work surface" | "A work surface that relates to or is designed for efficiency and comfort in the working environment." |
| Disputed Term 11: "substantially expanded sightlines" | "Sightlines that are considerably, materially or meaningfully enhanced." |
| Disputed Term 12: "the distance that the wrecker controls are located from the side surface of the vehicle exterior when the control panel is moved to a second position is about 1-2 feet" | "A distance measured from the outside surface of the vehicle, perpendicular to the vehicle, to the furthest extent of the wrecker controls away from the vehicle." |
| Disputed Term 13: "the wrecker controls comprise integrated electrical and hydraulic controls, each of which are located on a pair of consoles" | "The wrecker controls include both electrical and hydraulic controls located on control panels." |

These constructions will be without prejudice to Defendants' ability to challenge the validity of the patents based on lack of written description or indefiniteness under 35 U.S.C. § 112.

## V.    CONCLUSION

The Court construes the claim terms as stated above.  An

Appx0030

appropriate Order will be entered.


Date: April 13, 2023                    s/ Noel L. Hillman
At Camden, New Jersey                   NOEL L. HILLMAN, U.S.D.J.

UNITED STATES DISTRICT COURT<br>
DISTRICT OF NEW JERSEY

---

MILLER INDUSTRIES TOWING
EQUIPMENT INC.,

                Plaintiff,

     v.

NRC INDUSTRIES,

                Defendants.

Civ. No. 1:21-cv-08158-NLH-AMD

**ORDER**

---

    The Court having provided its construction of the disputed terms as set forth in the Court's Opinion filed today,

    IT IS on this 13th day of April, 2023

    ORDERED that the Parties consult with Magistrate Judge Ann Marie Donio for the entry of an appropriate scheduling Order.

At Camden, New Jersey

s/ Noel L. Hillman
NOEL L. HILLMAN, U.S.D.J.

Liza M. Walsh
Katelyn O'Reilly
Selina M. Ellis
Jessica K. Formichella
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
Phone: (973) 757-1100

*Of Counsel:*
Michael P. Mazza
Paul R. Hale
Michael P. Mazza, LLC
686 Crescent Blvd.
Glen Ellyn, Illinois 60137
Phone: (630) 858-5071
Fax: (630) 858-0373
Email: mazza@mazzallc.com
       paul@mazzallc.com

*Attorneys for Plaintiff*
*Miller Industries Towing Equipment Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MILLER INDUSTRIES TOWING EQUIPMENT INC., | Case No. 1:21-cv-08158 (NLH/EAP) |
| Plaintiff, | Hon. Noel L. Hillman, U.S.D.J. |
| v. | Hon. Elizabeth A. Pascal, U.S.M.J. |
| NRC INDUSTRIES, | |
| Defendant. | |

**FINAL JUDGMENT OF NONINFRINGEMENT,**
**PURSUANT TO FED.R.CIV.P. 54(b), AND ORDER TO STAY DEFENDANT NRC**
**INDUSTRIES' ANTITRUST AND INVALIDITY COUNTERCLAIMS**

WHEREAS, on April 5, 2021 (ECF No. 1, Complaint), Plaintiff Miller Industries Towing

Equipment Inc. ("MITE"), sued Defendant NRC Industries ("NRC") for infringement of various

claims of U.S. Pat. No. 9,440,577 ("MITE's Patent"), due to NRC's manufacture, sale, distribution

and use of its wreckers with a control panel supporting wrecker controls that is moveable outside

of the wrecker's side compartment, while being supported by the vehicle body ("the Accused

Controls") (*see e.g.*, ECF No. 1-4, Complaint Ex. 3, at 3/5).

1

WHEREAS, on February 4, 2022 (ECF No. 42, Answer and Counterclaims), NRC alleged antitrust, invalidity and noninfringement counterclaims against MITE.

WHEREAS, on April 13, 2023 (ECF No. 100), the Court issued its claim construction opinion, which construed the MITE Patent term "control panel" in a manner such that MITE cannot prevail on infringement (*id.*, at 16, last par.).

WHEREAS, MITE moved for final judgment of noninfringement under Fed. R. Civ. P. 54(b) (ECF No. 105) because there is no just reason for delaying certification of this final judgment of noninfringement to allow for appeal. MITE also requests that NRC's pending antitrust and invalidity counterclaims be stayed, pending appeal.

WHEREAS, NRC does not oppose MITE's motion under Fed. R. Civ. P. 54(b).

WHEREAS, the Court, having considered MITE's Fed. R. Civ. P. 54(b) motion (*id.*), hereby finds that:

1) The Court's construction of "control panel" (ECF No. 100, Opinion, at 16, last par.) results in a finding of no patent infringement in this case;

2) There is no just reason for delay to enter final judgement of noninfringement of MITE's Patent in favor of NRC against MITE;

3) In the interest of judicial efficiency, and to keep all claims on the same discovery and case schedule if this case returns to the district court after appeal, the Court also finds good cause to stay NRC's pending invalidity and antitrust counterclaims, pending appeal. There is no material risk of duplicative appeals regarding the counterclaims, as MITE's patent infringement cause of action is separate and distinct from NRC's counterclaims;

4) There is no legitimate probability that any issues to be determined on appeal – namely,

2

Appx0034

the correctness of the Court's claim construction as to the construction of "control panel" – would have to be relitigated in a subsequent appeal on the matters of invalidity or antitrust raised by NRC. Conversely, further litigation of NRC's counterclaims will not, and cannot, have any bearing on the infringement issues that would be before the Federal Circuit in an immediate appeal; and

    5) Prompt appeal may facilitate settlement of this matter.

Accordingly, the Court hereby **ORDERS** that MITE's motion for entry of final judgement of noninfringement, under Fed. R. Civ. P. 54(b), and to stay NRC's antitrust and invalidity counterclaims during appeal (ECF No. 105), is hereby **GRANTED**.

The Clerk of the Court is hereby directed to enter Fed. R. Civ. P. 54(b) final judgement of noninfringement of MITE's Patent in favor of NRC. NRC's remaining antitrust and invalidity counterclaims are also stayed, pending the resolution of the appeal.

**IT IS SO ORDERED**, this _18th_ day of _May_, 2023.

                                    Hon Noel L. Hillman
                                    United Sates District Judge

US009440577B2

(12) **United States Patent**
McConnell et al.

(10) **Patent No.:    US 9,440,577 B2**
(45) **Date of Patent:    Sep. 13, 2016**

(54) **VEHICLE WRECKER WITH IMPROVED CONTROLS**

(71) Applicants:**Ralph McConnell**, Chattanooga, TN (US); **Joseph C Brown**, Chattanooga, TN (US); **John L Hawkins**, Hixson, TN (US); **William G Miller, II**, Georgetown, TN (US); **Mark Dyer**, Ooltewah, TN (US)

(72) Inventors: **Ralph McConnell**, Chattanooga, TN (US); **Joseph C Brown**, Chattanooga, TN (US); **John L Hawkins**, Hixson, TN (US); **William G Miller, II**, Georgetown, TN (US); **Mark Dyer**, Ooltewah, TN (US)

(73) Assignee: **Miller Industries Towing Equipment, Inc.**, Ooltewah, TN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 29 days.

(21) Appl. No.: **14/247,072**

(22) Filed: **Apr. 7, 2014**

(65) **Prior Publication Data**

US 2015/0284219 A1    Oct. 8, 2015

(51) **Int. Cl.**
| | |
|---|---|
| *B60P 3/12* | (2006.01) |
| *B60P 1/54* | (2006.01) |
| *B66C 13/18* | (2006.01) |

(52) **U.S. Cl.**
CPC ................ *B60P 3/12* (2013.01); *B60P 1/5433* (2013.01); *B66C 13/18* (2013.01)

(58) **Field of Classification Search**
USPC ................. 414/563, 480, 409, 680; 180/89.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,784,035 | A * | 1/1974 | Dunbar ................... | B66C 23/78 212/302 |
| 6,092,975 | A * | 7/2000 | Cannon et al. ............... | 414/563 |
| 6,431,346 | B1 * | 8/2002 | Gilmore ................. | B65G 21/14 198/588 |
| 6,746,067 | B2 * | 6/2004 | Schmidt ................. | B60K 37/06 180/326 |
| 7,654,457 | B2 * | 2/2010 | Wilson ................. | G07C 13/00 235/386 |
| 2006/0237565 | A1 * | 10/2006 | Barker ............... | A01K 89/0114 242/229 |
| 2008/0162005 | A1 * | 7/2008 | Tang ...................... | B66C 13/40 701/50 |
| 2009/0285662 | A1 * | 11/2009 | Addleman ............... | B66C 23/80 414/563 |
| 2010/0314001 | A1 * | 12/2010 | Kappel ............... | A01G 23/067 144/334 |

* cited by examiner

*Primary Examiner* — Gerald McClain
*Assistant Examiner* — Ronald Jarrett
(74) *Attorney, Agent, or Firm* — Michael P. Mazza, LLC

(57) **ABSTRACT**

A wrecker-type recovery vehicle for recovering other, disabled vehicles, and a method for doing so, which may use a CAN Bus, and which may employ wrecker controls located a distance from a side surface of the vehicle exterior. Traveler rollers may be used to facilitate longitudinal movement of a travel base assembly supporting the boom, relative to the vehicle frame.

**22 Claims, 6 Drawing Sheets**





Fig. 1
PRIOR ART



Fig. 2

ADDED HAND

ROTATION ARROW

EYEBALL

**Fig. 3**





Fig. 3A

## Fig. 4



Fig. 5

US 9,440,577 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# VEHICLE WRECKER WITH IMPROVED CONTROLS

## BACKGROUND OF THE INVENTION

Pending U.S. Ser. No. 13/565,100, titled "Traveler Roller," filed Aug. 2, 2012, is hereby incorporated by reference in its entirety into this patent application.

The present invention generally relates to vehicle recovery devices with masts and booms ("vehicle wreckers"), including those that can be rotated ("rotating wreckers"), as well as those which cannot be rotated, and whose supporting travel base can be moved along the longitudinal axis of the wrecker, to increase the reach of the boom. Such large vehicle wreckers ("heavy wreckers") allow a large load to be lifted and then moved a given distance forward or rearward along the wrecker longitudinal axis.

The hydraulic controls for vehicle wreckers are typically located on a control panel located on the sidewall of the unit. A controller module sends electrical signals through a wiring harness to actuate solenoids at the hydraulic control valve spools. Wireless remote control systems communicating by radio signal with the controller module have also been utilized. However, vehicle wrecker users insist on redundant mechanical, manual back-up controls directly linked to the hydraulic valve, in the case of electrical failure. Such manual systems depend upon either mechanical linkages or cables, both of which restrict where the control levers and valves can be located.

The controls on a rotator or other heavy wrecker are typically located inside of a toolbox mounted on a sidewall of the wrecker, and are not comfortable for the wrecker operator to access, particularly if the operator is less than average height (see prior art FIG. 1). The toolbox may also partially shield the view of the operator as he attempts to work the controls and establish necessary sight lines during operation of the hydraulics for controlling outrigger, boom and winch movement.

Wreckers also typically have separate and independent controls for hydraulic boom, hydraulic outrigger and/or underlift and electrical (e.g., lighting) systems. (An underlift may be located in the rear of the wrecker.)

Accordingly, it would be advantageous to provide wrecker controls that are more easily accessible, as well as more ergonomically and visually appealing. It would also be advantageous to provide wrecker controls that eliminate redundant control levers, and are not tethered to a particular location on the wrecker. Further, it would be advantageous to integrate electrical and hydraulic controls on the same panel or touchscreen.

## SUMMARY OF THE INVENTION

The objects mentioned above, as well as other objects, are solved by the present invention, which overcomes disadvantages of prior wreckers, while providing new advantages not previously associated with them.

In a preferred embodiment of the invention, a wrecker-type recovery vehicle for recovering disabled vehicles is provided. The wrecker-type recovery vehicle includes a vehicle frame extending along a longitudinal axis, having a vehicle body with side surfaces, and carrying an extensible and retractable boom. Manually-manipulable wrecker controls may be moveable from a first position within the vehicle body or a compartment therefor, to a second position located a distance (e.g., 1-2 feet) from a side surface of the vehicle body, in a direction perpendicular to the longitudinal axis.

In a preferred embodiment, the wrecker controls may be located on an outwardly-opening door associated with a compartment located within an interior of the vehicle. Alternatively, for example, the wrecker controls may be located on an outwardly-sliding shelf within a compartment located within an interior of the vehicle. Preferably, the support for the wrecker controls (e.g., whether a door or a shell) may be positioned in a downwardly-angled orientation to create an ergonomic-oriented work station.

In a preferred embodiment, the wrecker controls may be in electrical communication with a CAN Bus and CAN controller of the vehicle. The wrecker controls may include: boom controls and/or lighting controls, and may include integrated electrical and hydraulic controls located on a single console, or in a pair of consoles, each of which are located on opposing sides of the wrecker. More preferably, the wrecker controls may include controls for: boom, winch, underlift, outrigger and lighting controls. It is also preferred that the wrecker controls include manual hydraulic controls which may be used in the event of an electrical failure.

In one type of wrecker useable with the present invention, the vehicle frame supports a travel base assembly carrying the boom, and the travel base assembly is capable of moving along the longitudinal axis of the frame. The boom may be of the traveling or non-traveling type, however, and the boom may also be of the rotating or non-rotating type.

In a preferred embodiment using a wrecker with a traveling boom, one or more traveler rollers are used to at least partially support the travel base assembly and to facilitate longitudinal movement of the travel base assembly relative to the vehicle frame. The individual rollers may be movable about a load-bearing member, and may be linked by a chain assembly.

In an alternative embodiment, a wrecker-type recovery vehicle for recovering other, disabled vehicles is provided, and includes a vehicle frame extending along a longitudinal axis, having a vehicle body with side surfaces, and carrying an extensible and retractable boom. Manually-manipulable wrecker controls in electrical communication with a CAN Bus and CAN controller of the vehicle are provided. The wrecker controls include integrated electrical and hydraulic controls located on a single console, or in a pair of consoles located on opposed side surfaces or compartments of the wrecker. Preferably, the wrecker controls are moveable from a first position within the vehicle body or a compartment therefor, to a second position located a distance from a side surface of the vehicle body, in a direction perpendicular to the longitudinal axis.

A method for controlling a wrecker-type recovery vehicle for recovering other, disabled vehicles is also provided. A wrecker vehicle frame extends along a longitudinal axis; the vehicle frame has a vehicle body with side surfaces, and carries an extensible and retractable boom. Manually-manipulable wrecker controls are provided, and moveable between a first position in which the wrecker controls are located within the vehicle body or a compartment therefor, to a second position in which the wrecker controls are located a distance from a side surface of the vehicle body, in a direction perpendicular to the longitudinal axis. By manipulating the wrecker controls, an operator in a standing position adjacent the side surface of the vehicle body can maintain his/her sightlines, including visual observation of forward-most and rearward-most boom locations. Again, the wrecker controls may include one or more of the following;

US 9,440,577 B2

3

boom, winch, underlift, outrigger and lighting controls. Also, traveling/non-traveling and/or rotating/non-rotating boom types may be used with the present invention. Traveler rollers may, but need not be, used.

Using the method of the present invention, the boom may be used, for example, to lift a load either: (a) from a position adjacent a rear of the recovery vehicle to a position both rearwardly and substantially distant from the rear of the wrecker; or (b) from a position adjacent a front of the recovery vehicle to a position adjacent a side of the recovery vehicle.

DEFINITION OF CLAIM TERMS

The terms used in the claims of the patent are intended to have their broadest meaning consistent with the requirements of law. Where alternative meanings are possible, the broadest meaning is intended. All words used in the claims are intended to be used in the normal, customary usage of grammar and the English language.

BRIEF DESCRIPTION OF THE DRAWINGS

The novel features which are characteristic of the invention are set forth in the appended claims. The invention itself, however, together with further objects and attendant advantages thereof, can be better understood by reference to the following description taken in connection with the accompanying drawings, in which:

FIG. 1 is a partial side and top perspective view of a prior art rotating wrecker with side tool box and wrecker controls located within the tool box;

FIG. 2 is a view similar to FIG. 1 showing a side tool box of one embodiment of the present invention with wrecker controls of this embodiment of the present invention located on a hinged door of the side tool box;

FIG. 3 is an enlarged top and side perspective view of the side tool box and wrecker controls shown in FIG. 2;

FIG. 3A is a view similar to FIG. 3 of an alternative embodiment of the side tool box;

FIG. 4 is a side view of the tool box and wrecker controls shown in FIG. 3; and

FIG. 5 is a top, schematic view of a preferred embodiment of the rotating wrecker of the present invention.

The components in the drawings are not necessarily to scale, emphasis instead being placed upon clearly illustrating the principles of the present invention. In the drawings, like reference numerals designate corresponding parts throughout the several views.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Set forth below is a description of what are believed to be the preferred embodiments and/or best examples of the invention claimed. Future and present alternatives and modifications to this preferred embodiment are contemplated. Any alternatives or modifications which, make insubstantial changes in function, in purpose, in structure, or in result are intended to be covered by the claims of this patent.

Referring now to prior art FIG. 1, rotating wrecker 10 with body 2 includes a wrecker assembly 8 with a telescoping boom 5 mounted on rotating bearing 7, which is in turned mounted on travel base assembly 3. Travel base assembly 3 moves over travel tubes 4 along the longitudinal axis of the rotating wrecker, in the direction of the double-arrow. As disclosed in U.S. Ser. No. 13/565,100, between

4

travel base assembly 3 and travel tubes 4, bearing pads, or alternatively one or more traveler rollers (i.e., rollers moveable about a load bearing member), may be located to facilitate movement of the travel base assembly over travel tubes 4. As can be seen in FIG. 1, conventionally, wrecker controls 12 are located within a side tool box 24 on the wrecker body 2. Due to this location, an operator, bent forward from the waist in order to use wrecker controls 12, has his/her sigh times of boom movement and the exterior reaches of the wrecker substantially compromised by the tool box and wrecker side exterior

Referring now to a preferred embodiment of the present invention shown in FIG. 2, new wrecker controls 30 may be located on a hinged, outwardly-opening door 25 of tool, box 24. Because the wrecker controls 30 are located on the door, spatially displaced from the inside of tool box 24, the operator can stand in a normal, vertical position, without having to bend forward, to work the controls. Preferably, the angle of the open door and the wrecker controls are oriented and situated at a suitable height to create an ergonomic work surface in about the same plane as the arms of an operator of average heights, when his/her arms are raised to a comfortable working position. The operator so situated is also provided with enhanced sight lines, as shown in FIG. 2, because the operator's head is no longer within, or closely adjacent the interior of, the tool box, enabling the operator to observe forward-most and rearward-most boom locations during its movement.

Alternatively, it will be appreciated that the same or similar ergonomic and enhanced sightline advantages may be obtained by locating wrecker controls on a forwardly-sliding shelf within a cabinet disposed within a side surface of the wrecker, for example.

Referring now to FIG. 3, outwardly-opening door 25 of wrecker side tool box 24 is shown. A console 30 such as a console made of a composite material, may be rigidly mounted (such as adhesively mounted, or attached using fasteners) on door 25, as shown. Console 30 may support wrecker controls generally designated as 31. As one non-limiting example, wrecker controls 31 may include a monitor or touchscreen 32 (e.g., CAN Bus PV780 touchscreen display), manual joystick 33a and paddle 33b controls, underlift control buttons 34, and emergency stop button 38. In one example; left joystick 33a may provide control over boom 5 (e.g., in/out, up/down, and "twist" for swing of the boom, by rotating bearing 7 about its vertical axis), using boom lift cylinder 80 (see FIG. 1), as well as telescoping cylinders (not shown) to extend or retract the boom; right joystick 33a may control movement of the main winches (not shown), including "twist" for their travel; and paddles 33b may be used to control auxiliary winches located, for example, outboard and rear of the turret base (not shown), which may rotate with the boom. Referring to FIG. 2, one or more of the joysticks, or other manual levers, may also be used to move travel assembly 3 along travel tubes 4, carrying the boom in a direction along the longitudinal axis of the vehicle frame. Referring back to FIG. 3, controls may also be provided at console 30, such, as using touchscreen 32, to extend or retract wrecker hydraulic outrigger legs, as is known in the art, in order to stabilize the wrecker during recovery operations. Underlift controls 34 may be used to extend or retract an underlift located at the rear end of the wrecker, to allow recovery of a disabled vehicle by its front wheels, for example. Additionally, touchscreen 32 may also be used to control lighting functions, as further discussed below.

US 9,440,577 B2

5

Referring to FIG. 3A, an alternative embodiment of side toolbox 24' is shown utilizing a shelf 25' supporting console 30 which slides in and out of toolbox 24', and an upper door 27' which can close the toolbox from the top.

FIG. 4 shows a side view of tool box 24, and door 25 with door handle 28, and console 30. When door 25 is closed, the outline of console 30 can be seen within the compartment of tool box 24. It can be appreciated from this view that the operator's head will be displaced a substantial distance (e.g., about 2-3 feet) from a side surface of the exterior of the wrecker during the operator's use of the door-mounted wrecker controls.

Referring now to FIG. 5, a top schematic view of a preferred embodiment of wrecker 10 of the present invention is shown, including front cab 9 and rear body 2. In this embodiment, front and rear outrigger valves 40, 51 may be located as shown. Upper front/turret hydraulic control valve 42 may be located on rotating turret 7 (shown in FIG. 1).

Conventional wrecker controls use mechanical linkage between the control levers (located in a toolbox on the sidewall of the wrecker) and the hydraulic valve spool. The new wrecker controls of the present invention, may be mounted, on a door of the toolbox (see FIG. 3) or directly mounted on the wrecker sidewall (not shown). As can be seen, the wrecker controls are mounted at a more comfortable height, and angled to create an ergonomic work surface in the same plane as the operator's arms when raised to a comfortable working position, than the conventional wrecker controls mounted within the interior or the tool box as shown in FIG. 2.

Instead of using mechanical linkage connected to the control levers, joysticks and paddles are provided, specific examples of which are described below, that are connected "fly-by-wire" via a CAN ("Controller Area Network") Bus circuit to the electrical solenoid-operated hydraulic control valve. (In a "fly-by-wire" system, control movements are converted to electrical signals transmitted by wires, and a computer or controller control module determines how to move the actuators at each control surface to provide the ordered response.) CAN Bus is a vehicle bus standard designed to allow microcontrollers and devices to communicate with each other within a vehicle without a host computer. CAN Bus is a message-based protocol, designed specifically for automotive applications but now also used in other areas such as aerospace, maritime, industrial automation and medical equipment. The devices that are connected by a CAN network are typically sensors, actuators, and other control devices. These devices are not connected directly to the bus, but through a host processor and a CAN controller.

To create an ergonomic and visually appealing control station, a mock-up of control station 30 was clay-molded, including display screen, joy sticks, paddles and push buttons, and this clay model was then scanned into a 3D model for use in manufacturing this part from composite material (see FIG. 3). The resulting control panel 30 provides: (1) improved ergonomics for the operator; (2) improved sight lines for the operator; (3) reduced mechanical complexity in the assembly of the unit; and (4) a hydraulic control valve that can be located anywhere on the wrecker because the restrictions created by routing mechanical linkages are eliminated. The control panel also integrates electrical (e.g., lighting) and hydraulic (e.g., boom, outrigger, winch, under-lift) controls, which is believed unique in the wrecker industry.

In case of electrical failure, small over-ride handles may be located on top of the main hydraulic control valves. In an emergency, these handles can be accessed by opening a

6

cover near the valve (not shown), to allow the hydraulic controls to be manually controlled.

In a preferred embodiment, using the CAN Bus, all of the hydraulic functions and switch functions may be controlled using 4 wires (2 for CAN, a power, and ground, bundled within harness 78, as shown on FIG. 3). This system permits control over all winch-related switches using the touch-screens to control mobile vehicle electronic control modules ("MVECs") via the CAN Bus. The system also permits control over all lights (beacon, work, brake, turn, markers and back-up) using the same scheme. It also allows control of the hydraulics via the CAN network, simplifying control station installation time significantly.

Referring to FIGS. 2, 3 and 5, a pair of control station modules 30 may each be located on a door of each rear tool box 24; these modules may be based on the use of CAN Bus networking for the components. Referring to FIG. 5, wireless receiver/controllers 44, such as Omnex R260 wireless receiver/controllers available from Eaton (Omnex near Vancouver, Canada, merged with Cooper-Bussmann, and then was purchased by Eaton), may be located as follows (e.g., 5 associated with turret 7 and 3 associated with front-side tool box 23).

Referring to FIG. 5, the CAN connections are shown by solid line 60, while hard wires are shown by dotted lines 81. A computer monitor, such as front PY450 touchscreen display 48, available from F. W. Murphy of Tulsa, Okla. (now a division of Enovation Controls), connects to CAN and to power, and sends and receives electrical signals.

The truck J1939 CAN bus 54 connects to CAN 60. Using this connection, the operator can control brake, turn, markers and back-up lights, and monitor truck information such as RPM, engine temperature and fuel level.

A remote control unit, such as a trusted wireless transmitter 47, may be provided in cab 9, and docked in a smart dock/charger 47a. Transmitter 47 may be an Omnex T110 remote available from Eaton Corporation (Omnex merged with Cooper-Bussmann, which was then acquired by Eaton), and may be connected to power and ground (for charging), and may also connect to front touchscreen display 48 as an input (there/absent).

Preferably one or more mobile vehicle electronic control modules (MVECs) 49 may be located in the front-side tool box 23 for outputting signals for lighting. For example, three Bussman MVECs 49 available from Eaton, may be used for this purpose, and connected to battery (not shown) and to wireless receivers/controllers 44a. MVECs 49 may be output to electrical junction box 75, and to both front and rear outrigger hydraulic valves 40,51 and to rear hydraulic control valve 41. (Front outrigger control valve 40 may be centered above front outriggers (not shown), and rear outrigger control valve 51 may be located above right rear outrigger (not shown)).

Three lower R260 wireless receivers/controllers 44a may be used to interpret the CAN signals from monitors or displays 31, 48, and truck the CAN bus to turn the MVEC outputs on/off, including body, marker, brake and turn lights, generically referenced by box 84. Lower R260s 44a may also be employed to send and receive radio remote inputs, and create signals for rear hydraulic control valve 51, which may control travel, underlift and drag winch features, and control winch switching features. Controllers 44a may also be used to send a CAN signal to the upper control loop via an electrical swivel (not shown). (As is well known in the art, an electrical swivel, consisting of a series of electrical contacts on a drum which rotates with, turret 7, allows the boom to rotate without interfering with electrical functions.)

US 9,440,577 B2

7

8

Wireless receivers/controllers, such as four upper Omnex R260s **44**b available from Eaton, which may be located in turret **7**, may be employed to receive CAN signals, power and ground and activate various functions on upper hydraulic control valve **42** also located in turret **7**, which may be used to control winches, boom and swing.

Depending on output requirements, it will be understood by persons of ordinary skill that a lesser or greater number of MVECs and receivers/controllers may be used.

As shown in FIG. **3**, a control panel module **30** may be mounted on each door **25** of rear tool boxes **24**, located on each side of the wrecker. Control panel module **30** may include a monitor or touchscreen displays, such as a PV780 touchscreen display **32** available from F. W. Murphy, as well as (e.g.) Eaton underlift-control keypad **34**, h and Omnex keypad **33** with (e.g.) paddles **33**b and/or joysticks **33**a, each of which may be connected to CAN and to power, and configured to send and receive electrical signals. For example, joysticks **33**a and/or paddles **33**b may be configured to send a CAN signal to each of R260s **44**a, **44**b, while underlift keypad **34** on control panel **30** may be configured to send, a CAN signal to main R260 injunction box **75**.

A remote control unit (ECU, not shown), such as an Omnex Raptor remote available from Eaton, may be located in a passenger-side rear compartment, and may be carried by the operator. The ECU may be used to transmit and receive radio signals from main R260, and allows remote control over all boom and winch functions, and allows the operator to lock-in the winches. The ECU also allows the operator to see the load on the boom.

Persons of ordinary skill in this art will now appreciate that the preferred system disclosed here includes the following features:

CAN-based control of lighting from multiple locations on the wrecker (e.g., the cab, and control consoles **30**);

CAN-based control of boom hydraulics from, either side of the vehicle (control consoles **30** on door **25** of each side toolbox **24**) and from a remote/RCU (the Eaton Raptor remote, for example);

CAN-based control of underlift hydraulics using on/off style remote/RCU;

CAN-based engine info and diagnostics;

CAN-based turn, marker, backup, and body lighting (using touchscreen **32** at consoles **30** and touchscreen **47** in the cab);

Integrates two systems into one with lighting and underlift control merging with proportional boom control, using consoles **30**;

Load-sensing capability, displayed on touchscreens **32**/**47** and the ECU:

The signals for brake, turn, markers, and backup can be sent over the CAN network to the MVECs that turn these lights on and off. (The MVECs may include a smartbreaker and relay modules in the tool box for this purpose.) A SenderCAN module from Murphy may be used to introduce these signals on a non-PACCAR or pre-2007 PACCAR chassis. (PACCAR is the parent company of Peterbilt and Kenworth.)

The improved system preferably eliminates all of the freespool and 2-speed switches (~12 per side) that are typically used along with control levers on rotating wreckers.

In addition to providing the improvements and advantages over prior technology described above, the present invention also preserves advantages of prior systems. For example, as described in pending U.S. Ser. No. 13/565,100, using the invention, a load may be lifted by the boom and moved between positions located at the rear and to the side of the recovery vehicle, without the need to first reposition the boom using boom lift or telescoping cylinders. Such further advantages include but are not limited to: providing engine information and diagnostics; monitoring of hydraulic temperature; a video screen for backup camera use or winch-watching; timer-based features like a job timer and maintenance reminders; using a portion of the VCAN-PAC-CAR J1939 CAN bus network to transmit data through the chassis (VCAN); and a GS monitoring system for Miller's Rotator product. ("GS" is GS North America, New Berlin, Wis.)

The above description is not intended to limit the meaning of the words used in the following claims that define the invention. Persons of ordinary skill in the art will understand that a variety of other designs still falling within the scope of the following claims may be envisioned and used. For example, while preferred embodiments involving a rotating wrecker, have been disclosed, in other embodiments the wrecker mast and boom need not be capable of rotating or traveling. It is contemplated that these additional examples, as well as future modifications in structure, function, or result to that disclosed here, will exist that are not substantial changes to what is claimed here, and that all such insubstantial changes in what is claimed are intended to be covered by the claims.

We claim:

**1**. A wrecker-type recovery vehicle for recovering other, disabled vehicles, comprising:

a vehicle frame extending along a longitudinal axis, the vehicle frame supporting a vehicle body and carrying an extensible and retractable boom; and

manually-manipulable wrecker controls located on and supported by a control panel stored within an interior compartment of the wrecker supported by the vehicle body, the wrecker controls configured to control movement of one or more wrecker components useful in vehicle recovery, wherein the control panel has a base end and a distal end opposite the base end; and

the control panel moveable from a first, storage position within the interior compartment of the vehicle body, wherein the control panel in the first position is operable to close off the interior compartment from an operator of the wrecker controls, to a second, operable position displaced from and outside the compartment and remote from the vehicle exterior, in a direction perpendicular to the longitudinal axis, wherein the control panel in the second position provides an open interior compartment in which the wrecker controls are located in a position where they may be manipulated by the operator, and wherein in the second position the control panel is downwardly-angled relative to ground such that the distal end is located remote from the vehicle body and below a horizontal axis parallel to ground and intersecting the base end, and wherein the control panel remains supported by the vehicle body while in the second position, whereby the displacement of the control panel to the second position comprises a strategic location of the wrecker controls, providing an operator with an ergonomically-enhanced work surface.

**2**. The wrecker-type recovery vehicle of claim **1**, wherein the distance that the wrecker controls are located from the side surface of the vehicle exterior when the control panel is moved to the second position is about 1-2 feet, and wherein an operator using the control panel in the second position has

US 9,440,577 B2

9 10

substantially expanded sight-lines as opposed to sightlines provided when the operator is using the control panel when located in the first position.

**3**. The wrecker-type recovery vehicle of claim **1**, wherein control panel comprises an outwardly-opening door associated with a compartment accessible from an exterior of the vehicle, and wherein the door can be closed to form a closed compartment.

**4**. The wrecker-type recovery vehicle of claim **1**, wherein the control panel comprises an outwardly-sliding shelf within a compartment located within an interior of the vehicle.

**5**. The wrecker-type recovery vehicle of claim **1**, wherein the wrecker controls are in electrical communication with a CAN Bus and CAN controller.

**6**. The wrecker-type recovery vehicle of claim **1**, wherein the wrecker controls include boom controls.

**7**. The wrecker-type recovery vehicle of claim **1**, wherein the wrecker controls include lighting controls.

**8**. The wrecker-type recovery vehicle of claim **1**, wherein the wrecker controls comprise integrated electrical and hydraulic controls located on a single console.

**9**. The wrecker-type recovery vehicle of claim **1**, wherein the wrecker controls comprise integrated electrical and hydraulic controls, each of which are located on a pair of consoles, and wherein each of the consoles are located within compartments situated on opposing sides of the wrecker.

**10**. The wrecker-type recovery vehicle of claim **1**, wherein the vehicle frame supports a travel base assembly carrying the boom, and the travel base assembly is capable of moving along the longitudinal axis of the frame, and further comprising a plurality of traveler rollers at least partially supporting the travel base assembly and facilitating longitudinal movement of the travel base assembly relative to the vehicle frame, wherein each of the traveler rollers comprises a plurality of individual rollers linked by a chain assembly and movable about a load-bearing member.

**11**. The wrecker-type recovery vehicle of claim **1**, wherein the boom is capable of rotating about an axis generally perpendicular to the longitudinal frame axis.

**12**. The wrecker-type recovery vehicle of claim **10**, wherein the vehicle frame includes a travel cylinder which is a motive force for the travel base assembly.

**13**. The wrecker-type recovery vehicle of claim **1**, wherein the wrecker controls include manual hydraulic controls which may be used in the event of an electrical failure.

**14**. A wrecker-type recovery vehicle for recovering other, disabled vehicles, comprising:

a vehicle frame extending along a longitudinal axis, the vehicle frame including a vehicle exterior, and the vehicle frame carrying an extensible and retractable boom; and

manually-manipulable wrecker controls located on and supported by a control panel stored within an interior compartment of the wrecker supported by the vehicle frame, wherein the control panel has a base end and a distal end opposite the base end;

wherein the wrecker controls are in electrical communication with a CAN Bus and CAN controller of the vehicle, the wrecker controls comprising integrated electrical and hydraulic controls located on a single console;

wherein the control panel is moveable from a first, storage position, thereby closing the interior compartment, to a second, operable position displaced from and outside

the compartment, thereby opening the interior compartment so that the operator can manipulate the wrecker controls, wherein the control panel remains supported by the vehicle frame when the control panel is in the second position, and wherein in the second position the control panel is downwardly-angled relative to ground such that the distal end is located remote from the vehicle body and below a horizontal axis parallel to ground and intersecting the base end, whereby the displacement of the control panel to the second position comprises a strategic location of the wrecker controls, providing an operator with an ergonomically-enhanced work surface.

**15**. The wrecker-type recovery vehicle of claim **14**, wherein the manually-manipulable wrecker controls are moveable from a first position within the vehicle exterior or a compartment therefor, to a second position located a distance from a side surface of the vehicle exterior, in a direction perpendicular to the longitudinal axis.

**16**. A method for controlling a wrecker-type recovery vehicle for recovering other, disabled vehicles, comprising the steps of:

providing a wrecker vehicle frame extending along a longitudinal axis, the vehicle frame including a vehicle body with side surfaces, and the vehicle frame carrying an extensible and retractable boom; and

providing manually-manipulable wrecker controls located on and supported by a control panel, the control panel supported by the vehicle body and stored within an interior compartment of the vehicle body, the control panel comprising an outwardly-opening door associated with the interior compartment accessible from an exterior of the vehicle, and wherein when the door is closed a closed interior compartment is provided, and when the door is open this exposes the wrecker controls to operator manipulation;

wherein when the control panel door is opened, the control panel is moveable from a first, storage position within the interior compartment inside the vehicle exterior, to a second, operable position in which the control panel is displaced from and outside the interior compartment and the vehicle exterior, in a direction perpendicular to the longitudinal axis, wherein the control panel remains supported by the vehicle body while in the second position;

whereby the wrecker controls can be manipulated when in the second position, such that an operator in a standing position adjacent the vehicle body and working the wrecker controls when the control panel is in the second position, has substantially expanded sightlines as opposed to when the operator is in a standing position working the wrecker controls when the control panel is in the first position, and wherein the displacement of the control panel to the second position comprises a strategic location of the wrecker controls, providing an operator with an ergonomically-enhanced work surface.

**17**. The method of claim **16**, wherein the wrecker controls include one or more of the following: boom, winch, under-lift, outrigger and lighting controls.

**18**. The method of claim **16**, wherein the vehicle frame supports a travel base assembly carrying the boom, the travel base assembly is capable of moving along the longitudinal axis of the frame, and the travel base assembly supports a rotating member allowing the boom to be rotated about a vertical axis substantially perpendicular to the longitudinal axis of the frame, and further comprising two or more

US 9,440,577 B2

11

traveler rollers at least partially supporting the travel base assembly and facilitating longitudinal movement of the travel base assembly relative to the vehicle frame, wherein the traveler rollers comprise a plurality of individual rollers linked by a chain of assembly and movable about a load-bearing member.

**19.** The method of claim **16,** further comprising two or more traveler rollers at least partially supporting the travel base assembly and facilitating longitudinal movement of the travel base assembly relative to the vehicle frame, wherein the traveler rollers comprise a plurality of rollers linked by a chain assembly and movable about a load-bearing member.

**20.** The method of claim **16,** further comprising the step of using the boom to lift a load either: (a) from a position adjacent a rear of the recovery vehicle to a position both rearwardly and substantially distant from the rear of the wrecker; or (b) from a position adjacent a front of the recovery vehicle to a position adjacent a side of the recovery vehicle.

**21.** The method of claim **16,** wherein the control panel is mounted on a support positioned at a downwardly-angled orientation relative to ground to facilitate the creation of an ergonomic-oriented work station.

**22.** A wrecker-type recovery vehicle for recovering other, disabled vehicles, comprising:

12

a vehicle frame extending along a longitudinal axis, the vehicle frame supporting a vehicle body and carrying an extensible and retractable boom; and

manually-manipulable wrecker controls located on and supported by a control panel comprising an outwardly-sliding shelf, the control panel supported by the vehicle body and stored within an interior compartment of the vehicle body, wherein the wrecker controls are configured to control movement of one or more wrecker components useful in vehicle recovery;

a door separate from the control panel for closing and opening the interior compartment, wherein the door is sliding and generally vertically moving;

wherein, using the shelf, the control panel is moveable from a first, storage position within the interior compartment, to a second, operable position displaced from and outside the compartment, in a direction perpendicular to the longitudinal axis, wherein the control panel remains supported by the vehicle body while in the second position, and whereby the displacement of the control panel to the second position comprises a strategic location of the wrecker controls, providing an operator with an ergonomically-enhanced work surface.

\* \* \* \* \*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  23-2047

**Short Case Caption:**  Miller Industries Towing Equipment Inc. v. NRC Industries

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes _12700_ words.

- [ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

- [ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: _08/29/2023_

Signature:  s/Michael P. Mazza/

Name:  Michael P. Mazza

117

Save for Filing

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 29, 2023, I served the foregoing

Brief for Appellant on each party separately represented *via* CM-ECF.


Dated: August 29, 2023                    /s/<u>Michael P. Mazza</u>